**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE et al., Plaintiffs,**

**v.**

**Joseph H. OAKEY, as Commissioner of Education of the State of Vermont, and Frank H. Davis, as State Treasurer of the State of Vermont, Defendants,**

**Rev. Raymond A. Adams, et al., Intervenors.**

**Civ. A. No. 6393.**

United States District Court,
D. Vermont.
March 6, 1972.

Franklin C. Salisbury, Washington, D. C., Richard H. Thomas, Thomas, Alexander & McLoughlin, Burlington, Vt., for plaintiffs.

James M. Jeffords, Atty. Gen. of Vt., Martin K. Miller, Asst. Atty. Gen., for defendants.

Lawrence A. Wright, Gravel & Shea, Burlington, Vt., for intervenors.

Before WATERMAN and OAKES, Circuit Judges, and LEDDY, District Judge.*

WATERMAN, Circuit Judge.

Prior to 1971 the Vermont Statutes provided that state aid [1] to education

---

* See text, infra at 548.

1. 16 V.S.A. § 3441(3) defines "state aid": "State aid means funds granted by the state to a school district pursuant to this chapter [Chapter 123 of Title 16 V.S.A.]." In his brief for the defendants the Attorney General has explained how these funds are calculated for each school district. This official explanation follows:

Public schools in Vermont are primarily funded by local school districts through the levy and collection of property taxes. Because some districts have greater wealth per school child than others, they can raise more school funds than other districts, while maintaining a tax rate at the same level as the other districts. These more wealthy districts can also, of course, enjoy a lower

could be provided only to "public schools." In April, 1971, the Vermont General Assembly enacted legislation which made it possible for non-public schools to share, in a limited manner, in the aid provided by the state. That Act, No. 114 of the Acts and Resolves of the 1971 General Assembly, the plaintiffs claim, is on its face, violative of the First and Fourteenth Amendments of the U. S. Constitution. The pertinent provisions of No. 114 are found in the Revised Statutes at 16 V.S.A. §§ 3441, 3445, 3471(3), 3471(4).

Under the new legislation, state aid, paid directly to the public school district, may be used "only for legitimate items of current expense . . . . " 16 V.S.A. § 3445. The aid may be used by the school district "for aid to schools other than public schools as defined in section 3441(2) . . . ." [2] including schools which are operated by religious organizations. However, the aid which may be extended by local school districts to non-public schools is limited both as to purpose and amount. State aid can be used, 16 V.S.A. § 3445, only for legiti-

mate items of current expense of the school district. However, by Act 114, § 5, the General Assembly in 1971 added the following language to the preexisting definition, 16 V.S.A. § 3441(6), of "current expenditure."

"For the purposes of chapter 123 of Title 16 the term current expenditures shall include in addition to any other definition all moneys expended by a district for providing teachers and educational materials for the teaching of physical sciences, modern languages, physical education and mathematics, or any combination thereof, in any nonpublic school approved by the state board of education, provided that all such teachers are qualified under sections 1691–1695 of this title and are under contract to the district and under the supervision of the superintendent thereof."

No state aid money flows directly from the State to the non-public schools. Rather, state aid is provided by the State to the school district which then may or may not furnish the permitted aid to

---

tax rate while collecting the same amount of taxes as a less wealthy school district. The State of Vermont, because it is interested in the education of all Vermont children, attempts to eliminate the disparity between the wealthy and poor districts by subsidizing the less wealthy districts a certain percentage of the district's current expenditures. This funding is accomplished by: (1) Dividing the State wealth per pupil [this is computed by determining the State Equalized Grand List (State EGL) which is 1% of the fair market value of all taxable properties in all school districts *divided by* the State Average Daily Membership (State ADM) which is the average per diem attendance at "approved" schools] into a school district's wealth per pupil [this is computed by determining the District's Equalized Grand List (District EGL) divided by the District's Average Daily Membership (District ADM)], the quotient of which is called the District Multiplier. 16 V.S.A., Sec. 3471 (1971 Supp.); and (2), multiplying the District Multiplier by 60 and subtracting the result of that multiplication from 100 to determine the percentage

of a district's current expenditures that the State will reimburse. (Parenthetically, the 60 multiplier may go up or down depending upon the relationship of the amount of the legislative appropriation to the sum of all current school expenditures in the state. 16 V.S.A. § 3472 (1971 Supp.)).

2. 16 V.S.A. § 3441(2) defines "public school":

"Public school means any school which provides elementary or secondary school education as defined in this title, and which received its principal support from public funds; and shall also include a private school to which a Vermont school district pays tuition from public funds on behalf of a pupil."

Of course any elementary or secondary school which is operated by a religious organization is not comprehended within this statutory definition, for those schools do not receive their principal support from public funds and a public school district may not pay tuition to a church related school on behalf of a pupil. Swart v. South Burlington Town School District, 122 Vt. 177, 167 A.2d 514 (1961).

non-public schools, and the Act contains a further limitation insofar as the maximum percentage of such aid extended by the school district may be reimbursed by the State.[3]

Act No. 114 became effective on August 15, 1971, and a few weeks thereafter the plaintiffs filed their complaint in the District Court.

The organizational plaintiff is an association of persons whose common objectives are the separation of church and state and the opposition to the use of public funds for the support in whole or in part of sectarian schools. Each individual plaintiff is a citizen and taxpayer of the United States and the State of Vermont.

Plaintiffs' complaint seeks injunctive and declaratory relief against the defendants, the Commissioner of Education and the State Treasurer of the State of Vermont. Plaintiffs allege that Act No. 114 is on its face a law respecting the establishment of religion in violation of the First Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment, and they seek a declaratory judgment stating so. They sought a preliminary injunction pending trial and permanent injunctions against the defendant the Commissioner of Education, enjoining him from approving the payment of any funds under the Act or participating in any way in its administration, and against the defendant the State Treasurer, from paying out any funds pursuant to the Act.

Pending disposition of the prayers for a temporary injunction and for the convening of a three-judge district court, Chief Judge Leddy granted a motion to intervene as parties defendant of the five intervenors, Vermont citizens who were found by him to have a legitimate interest to protect in the proceeding.

A three-judge court was ordered convened, Circuit Judges Waterman and Oakes being designated to sit with Chief Judge Leddy. The hearing on the motion for a temporary injunction was consolidated with the motion for a permanent injunction and the entire case was presented to the three judges on December 28, 1971. Any claim that the organizational plaintiff lacked standing to proceed was withdrawn.

No witness testified and no evidence was introduced. With the exception of the factual allegations of paragraph 14 of the complaint, quoted and discussed infra, all the parties agreed that the allegations in the complaint, pertinent to the attack upon the statute, raised questions of law only. Pursuant to this understanding, the case, after oral argument, was submitted for decision. The issue before the court, therefore, became whether, under the most favorable interpretation that could be placed upon the language the General Assembly employed, the statute, on its face, can withstand constitutional attack upon it.

During the following week the judges distributed voting memoranda and unanimously agreed to grant plaintiffs' prayers in full, and then, unfortunately, on January 9, 1972, Chief Judge Leddy, who had handled all the details of the proceeding, died. As a result, Judges Oakes and Waterman file an opinion and order as surviving members of the court, and the writer of the opinion has attempted in it to preserve and express the thinking of Chief Judge Leddy as well as the thinking of the two of us who have survived.

The First Amendment to the U. S. Constitution prohibits the Congress from

---

3. No. 114 of the Acts of 1971 caused 16 V.S.A. § 3471(4) to read as follows:
    (4) The amount of additional state aid paid to a school district resulting from an increase in average daily membership calculated on the basis of aid granted to schools other than public schools and from an increase in current expenditures used for schools other than public schools shall not exceed 50 percent of such increase in current expenditures notwithstanding other provisions of this section and of section 3441(1) of this title.

making any "law respecting an establishment of religion, or prohibiting the free exercise thereof." The Fourteenth Amendment applies these prohibitions to state action. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

No. 114 provides that if the town or city school district chooses to do so, and a parochial school located therein is approved by the state, the district may provide state-approved teachers who have teaching contracts with the school district, and may provide "current expenses" (defined in 16 V.S.A. § 3445), to the parochial school; provided, however, that the teachers teach no subjects other than the physical sciences, modern languages, physical education, and mathematics, and that the teachers remain under the supervision of the school district superintendent.

If this program is adopted in a school district the state will pay to the town-school district in connection with the allocation its due under the State Aid to Education statutory provisions (see footnote 1, *supra*) additional sums not to exceed 50% of any additional amount it cost the school district to assist in this limited way the parochial institution's financial burdens. (See footnote 3, *supra*.).

Subsequent to the passage of No. 114 and prior to the commencement of this action, the U. S. Supreme Court, on June 28, 1971, handed down far-reaching decisions invalidating certain Pennsylvania and Rhode Island laws relating to state aid to nonpublic schools. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (decided with Earley v. DiCenso and Robinson v. DiCenso). Regarding the Establishment Clause, the Court pointed out that there were three primary tests of constitutionality: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education [of Central School Dist. No. 1] v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz, supra,* [397 U.S.] at 674, 90 S.Ct. at 1414." *Lemon, supra* at 2111. This last test, involving government entanglement in religion has been developed by the Court relatively recently, *Lemon, supra;* Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Its emergence as an independent test is significant in that its co-equal combination with the "primary effect" test (see *Allen, supra*) creates a constitutional Scylla and Charybdis which causes any state program designed to aid its parochial schools to find hazardous sailing.

The theory behind the First Amendment's Establishment Clause proscription is simply stated. In order that any funds, goods, or services granted by the state do not have the impermissible effect of advancing religion, the state must see that the effects of any such grant will not permit of their being put to religious uses. Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed. 2d 790 (1971); Lemon v. Kurtzman, *supra;* see "The Supreme Court, 1970 Term," 85 Harv.L.Rev. at 172 (1971). Moreover, depending upon the particular circumstances of any particular situation, the state, as in *Walz, supra,* may have a *continuing* duty to ascertain that the state aid, even if not apparently proscribed initially, is not *subsequently* put to religious uses. *Lemon, supra,* 91 S.Ct. at 2112. Proceeding on the assumption that the secular and religious functions of the parochial schools may be separated, *id.* at 2111, the Court intimated in *Lemon, supra,* but did not rule, that state aid granted under adequate precautions and restrictions to insure that the aid only benefitted the secular role of the parochial schools might not effect an impermissible advancement of reli- -

gion.[4] It can well be that in order to avoid the Scylla of the "primary effect" test by carefully setting up limitations and restrictions with reference to use of state aid funds the state may find that the supervision required to police the grant causes it to become so deeply "entangled" in religious matters as to find its plan shipwrecked on the Charybdis of overinvolvement in parochial matters.[5]

It is by no means clear how much involvement constitutes too much, i. e., "excessive" involvement. Indeed, the Court stated in *Tilton, supra,* 91 S.Ct. at 2095: "Every analysis must begin with the candid acknowledgment that there is no single constitutional caliper which can be used to measure the precise degree to which [this factor is] present or absent." Moreover, it is clear that some state involvement with religious institutions is inevitable. *Lemon, supra,* 91 S.Ct. at 2112; *Walz, supra;* and see discussion in Zorach v. Clauson, 343 U.S. 306, 312, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). To quote the Chief Justice, speaking for the Court in *Lemon supra,* 91 S.Ct. at 2112, "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct and variable barrier depending on all the circumstances of a particular relationship."

Because the Court set up no firm guidelines as to what kind of involvement breaches that blurry barrier between church and state, the holdings in *Lemon* must, of course, be examined in the light of the particular fact-situations comprehended by the Rhode Island and Pennsylvania Statutes.

Rhode Island enacted its Salary Supplement Act in 1969. Pursuant to the Act, state officials were to supplement by 15% the salaries of teachers of secular subjects in nonpublic schools at which the average per pupil expenditure was below the average in public schools. Nonpublic schools eligible for the grants were required to submit financial data relevant to the schools' per pupil expenditures. If that expenditure was in excess of the statutory limitation, the records of the school were to be examined by the public authorities so as to determine how much was spent on religious education and how much was spent on secular. There were further restrictions in the Act to assure that the aid did not benefit religiously oriented courses. For example, in order to be eligible for the supplement, the teachers could teach only the subjects offered in the Rhode Island public schools and could use only the teaching materials used in the public schools. Moreover, the teacher had to sign a written agreement to the effect that he would not teach a course in religion while receiving a state supplement.

"By its terms the Pennsylvania Act [24 Pa.Stat.Ann. § 5604] allows the State to provide funds directly to private schools to purchase 'secular educational services' such as teachers' salaries, text-

---

4. But see in *Lemon* the concurring opinion of Justice Douglas, joined by Justice Black, 91 S.Ct. 2117, and the concurring opinion of Justice Brennan, 91 S.Ct. 2126. These Justices eloquently maintain that the Pennsylvania and Rhode Island statutes do provide for an impermissible advancement of religion and do violate the Establishment Clause. Moreover, they indicate that the Free Exercise Clause is also violated. (Justice Marshall, who did not participate in the Pennsylvania appeal, concurred in Justice Douglas's opinion insofar as it applied to the interpretation of the Rhode Island statute).

5. For example, Justice White in *Lemon* summarizes his reaction to the Court's holding in that case striking down the Rhode Island statute:

The Court thus creates an insoluble paradox for the State and the parochial schools. The State cannot finance secular instruction if it permits religion to be taught in the same classroom; but if it exacts a promise that religion not be so taught—a promise the school and its teachers are quite willing and on this record able to give—and enforces it, it is then entangled in the "no entanglement" aspect of the Court's Establishment Clause jurisprudence. 91 S.Ct. 2138.

books, and educational materials." The statute was carefully limited so that: "Reimbursement is prohibited for any course containing subject matter 'ex‑pressing religious teaching, or the morals or forms of worship of any sect.' 24 Pa.Stat.Ann. § 5603." *Lemon, supra* at 2117 (Douglas, J., concurring). Only expenses for courses in mathematics, modern foreign languages, physical science and physical education were re‑imbursable, and any textbooks or in‑structional materials used in these so‑specified courses had to be approved by the State Superintendent of Public Edu‑cation.

The Court did not conclusively weigh the constitutionality of these statutes by applying to them the "primary effects" test. It ruled instead " . . . that the *cumulative impact* of the entire relation‑ship arising under the statutes in each State involves excessive entanglement be‑tween government and religion." *Lemon, supra* at 2112. (Emphasis added). The Court posited that it could not be as‑sumed that secular teachers under reli‑gious discipline could avoid conflicts be‑tween secularism and sectarianism:

> A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be in‑spected once so as to determine the ex‑tent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic con‑tacts will involve excessive and en‑during entanglement between state and church. *Lemon, supra* at 2114.

The Court also demonstrated that these two state plans also failed to avoid con‑stitutional impingement in that they en‑tangled the church and state in yet other ways. For example, the financial ar‑rangements made the state governments, in effect, auditors of the books of the church-related schools. As the Court stated, *Lemon, supra* at 2115, such a post-audit power "creates an intimate and continuing relationship between church and state." Finally, both of the plans would have brought religious con‑troversy directly into the midstream of politics. Above all else, it seems quite clear that the founding fathers, knowl‑edgeable in English and European his‑tory, feared political division along reli‑gious lines, and they sought to prevent this kind of evil through the adoption of the First Amendment.

■■ In turning to the statute be‑fore us, we have in mind that the com‑plaint alleges in Paragraph 14, the truth of which was admitted in argument, that:

> Some of the church schools which will be aided under the Act by intent and result are Roman Catholic paro‑chial schools which are a part of the religious mission of the Catholic Church. All the church schools are vehicles for transmitting the faith of the sponsoring church to the next gen‑eration.

Clearly, involvement with this vital and valuable religious activity results in an involvement with the religion itself. Any intrusion, however small, into these parochial schools by the state must be viewed in the light of the neutrality envisioned by the First Amendment. The Vermont Act will thrust the state not only directly into the physical plants of the schools but also into their opera‑tion and control. As such it surely in‑volves excessive entanglement between government and religion.

It is contended that because all the hiring of instructors and all the buying of teaching materials for the statutorily specified secular subjects is arranged for by the local school districts, there will be but little entanglement between church and state. The actual mechanics of this intrusion by the employees of the school districts into the sectarian schools is not spelled out in the statute. Presumably, the implementation of the plan is left to the school districts themselves. The potential, however, for involvement of the state, through the school districts,

in religious affairs is not dispelled by its lack of articulation.

On its face the statute will create within the established hierarchy of parochial school administration a unit of teachers whose loyalties do not run to the school's administration but rather to the superintendent of the school district. The Court pointed out in *Lemon, supra,* 91 S.Ct. at 2113, that, "Religious authority necessarily pervades the [parochial] school system[s]." Through the state control of teachers in the church schools, government control would become entangled with the existing religious control, and the day-to-day instructional administration would of necessity be the result of close cooperation between the school's administration and the public school district's administration.

More far reaching, however, is the involvement that will come about through the state's power over the purse strings. Under the statute, the school district may provide for use in the parochial schools as many (or as few) teachers as it wishes to allocate to instruct in the specified "secular" subjects. The power to make that determination gives the power to the secular authority to shape the policies of the sectarian schools. "The history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance." *Lemon, supra* at 2115. This is, of course, true when, as here, the direct subsidy takes the form of the supplying of teachers and of teaching materials instead of the furnishing of cash. Thus, it becomes highly probable that parochial school policy would, under the Vermont enactment, become the product of an interaction between the religious and the sectarian authorities, an interaction which in this case obviously would result in an excessive entanglement of the state in religious matters.

We have, thus far, concentrated on the potential entanglement resulting from state-sponsored involvement in religious affairs. The statute also creates a similar potential for church involvement in the political process. It is inevitable that the opportunity for aid would lead to an involvement of the religious authorities in the determinations relative to teacher-choice and teacher-allocation to be made by the school district's school board and superintendent. Decisions as to the character and number of the teachers provided the parochial schools will require close cooperation between the sectarian school authorities and the public school district management. We would have to ignore reality to think that the responsibile heads of the parochial schools would not try to influence the Board to make decisions in this area favoring that religion. Any such involvement carries with it the explosive potential for citizen friction and political subdivision along religious lines. School district budgets are determined annually and are the subject of extensive citizen debate. The Court has instructed us that, "It would be unrealistic to ignore the fact that many people confronted wtih issues of this kind will find their votes aligned with their faith." *Lemon, supra* at 2116. The dangers of involving religious issues into the political process—especially those which are recurrent and emotionally charged—have been too often enumerated to require, restatement here. See *Lemon, supra* at 2116; *Walz, supra,* 90 S.Ct. at 1424 (Harlan, J., concurring); Board of Education v. Allen, *supra.* Suffice it to say that this entanglement was feared most by the framers of the First Amendment.

While our approach on the entanglement issues could dispose of this case, we also point out that in the operation of this statute a potential exists for the impermissible fostering of religion. We are not convinced that the statute as written guarantees that the parochial school utilization of school district teachers would not have the primary effect of the advancement of religion. As was noted in *Lemon,* the use of teachers—even for so-called secular subjects—on any program that utilizes sectarian facilities involves variables

which are not, prior to program operation, readily ascertainable. The existence of those variables is not likely to be dispelled by the fact that the secular teachers are hired by, and are theoretically responsible to, the public school superintendent. We need not question the good faith of the school districts in hiring teachers on a religiously neutral basis. Once within the church school, however, the instruction would become subject to pressures which the Court has warned us would make religious neutrality extremely difficult. The sectarian mission of the church-based parochial school cannot be overemphasized. It is unlikely that such schools carried on under religious auspices would exist if it were not for that mission. Hence, the role of the dedicated teacher therein is paramount. Religious authorities and the parents of parochial school pupils have a vital and most worthwhile religiously-concerned interest in the message conveyed to the pupils by the teacher. Otherwise, the pupils would have been entered in public school. Even without overt attempts to influence the teaching program of the secular instructor, the teacher would still be subject to the subtle but effective pressure of parochial administrative and religiously-oriented parental approval. Moreover, the atmosphere of religion quite properly pervades the plant of a parochial school. Whether he be hired by the district or by the parochial school, no one can predict how any teacher will act or react when placed in that atmosphere.

It may well be that, as the Court indicates likely, *Lemon*, 91 S.Ct. at 2114, the state would need, in order to protect the public fisc, and the integrity of the statute, to set up a system of surveillance to see that the intent of the statute is carried out and to see that no public funds are used to further the religious mission of the parochial school. Such a surveillance would involve the state to an even greater degree in the affairs of the religious institution and "involve excessive and enduring entanglement between state and church." *Lemon, supra* at 2114.

It is always an unpleasant task, a task that, regrettably, cannot be conscientiously avoided, for a court to hold a legislative enactment violative of constitutional limitations upon parliamentary action; but, for the reasons above explicated, we grant the plaintiffs' prayer and decree that a permanent injunction issue.

OAKES, Circuit Judge (concurring):

I concur in the crystal clear opinion of my colleague, Judge Waterman. I do so because I feel compelled to by the reasoning of Lemon v. Kurzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which as an inferior court we are required to follow. I do so with regret, however, for it concerns me lest the inevitable result of the prohibition against "excessive entanglement," now coupled with the test of "impermissible involvement," may signify the ultimate demise of the parochial school in America.

To me, this would be a most unfortunate result. Ours has been a pluralistic socity, fostering creativity out of multiple peoples, religious and philosophical systems of thought, and ethnic ties. *Cf.* R. Niebuhr, A Note on Pluralism, in Religion in America 42 (1958). In the advancement of this pluralistic society, the parochial school system has played a not insignificant part. *Lemon,* I fear, will tend toward a homogenization of American education. There will, therefore, be all the more reason to search for ways within the American system of public education that will preserve, indeed promote, the diversity of individual belief—religious, political and social —that, along with our Bill of Rights, distinguishes us so plainly from certain uniform, unified and uni-governed societies elsewhere in the world.