**Anna BARRERA et al., Appellants,**

**v.**

**Hubert WHEELER et al., Appellees.**

**No. 72–1440.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1973.

Decided March 16, 1973.

Rehearing and Rehearing En Banc
Denied April 11, 1973.

---

Thomas M. Sullivan, Kansas City, Mo., and Louis C. DeFeo, Jr., Jefferson City, Mo., for appellants.

Leo Pfeffer, New York City, for appellees.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

We are presented on this appeal with significant questions relating to the lawful programming and proper allocation of funds to educationally deprived school children, both public and private, under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241a–241m, 242–244 (1972).[1]

The plaintiffs, suing individually and on behalf of their minor children, are parents of educationally deprived children who attend non-public schools in the State of Missouri. This class suit was commenced on April 6, 1970, in the United States District Court for the Western District of Missouri against the State Commissioner of Education and the eight members of the Missouri

---

1. The declared purpose of Title I is "to provide financial assistance . . . to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means . . . which contribute particularly to meeting the special educational needs of educationally deprived children." 20 U.S.C. § 241a (1972).

Board of Education. The plaintiffs claim that Title I funds are being arbitrarily denied to non-public school children in Missouri. In seeking injunctive relief plaintiffs assert violations of the First and Fourteenth Amendments and a denial of their civil rights under 42 U.S.C. § 1983.

Plaintiffs originally prayed for an injunction restraining defendants from continued violations of the Act as well as for an accounting of misapplied funds totalling over $13 million received and expended from 1966 through 1969. The trial court initially dismissed plaintiffs' action because of their alleged failure to exhaust administrative remedies and because it believed the federal court should abstain from exercising jurisdiction since the case involved unsettled questions of state law. This court held these findings to be erroneous and reversed and remanded the case to the district court for trial. Barrera v. Wheeler, 441 F.2d 795 (8 Cir. 1971). Upon remand of the case plaintiffs filed an application for preliminary injunction on October 12, 1971. In a pretrial order on January 18, 1972, the trial court ordered a separate trial as to issuance of the injunction and limited the issues as follows:

1. Whether Title I, ESEA, and the criteria established thereunder by the United States Commissioner of Education, requires that educational benefits provided by Title I be made available to educationally deprived children attending private schools on a basis that is equitable in quality, scope and opportunity, to those available to educationally deprived children attending public schools and that there must be an equitable sharing of educational resources provided by Title I so that the amount expended for each Title I project as to an educationally deprived child attending a private school be as nearly equal as possible to the amount so expended as to each educationally deprived child attending a public school;

2. Whether the defendants may be excused from complying with the requirements of Title I, ESEA, and the criteria established thereunder by the United States Commissioner of Education, relating to the participation of educationally deprived children attending private schools, by reliance upon any interpretation of Missouri state constitutional provisions, statutes, regulations or state court decisions; and

3. Whether it is lawful to make public personnel, who are employed to implement Title I projects, available on private school premises during regular school hours in order to provide special services to educationally deprived children attending private schools.

Upon trial of those issues the district court, in an unpublished opinion, denied injunctive relief and held that whether Missouri state law "prohibits the use of *any* money" for teachers to be employed in private schools was not necessary to be decided in the case. The court concluded that although there undoubtedly has been inequitable expenditures of Title I funds between educationally deprived children in public and non-public schools in some local school districts, such inequity could be rectified by private school authorities requesting their "equitable share of dollar aid" for private school pupils to attend after-school and summer school instructional programs.[2]

---

2. The trial court further found:
"Title I clearly does not mandate the assignment of teachers paid by Title I funds to nonpublic schools. The legislative history of the Act demonstrates that such an intention was completely disavowed by every proponent of the bill. It is also clear that students in nonpublic schools can receive their equitable mathematical share of the funds available in after-school or summer school programs. In small school districts the furnishing of visual aids and mobile equipment could very easily furnish the equitable share of dollar aid.

We conclude that the district court's holding does not properly meet plaintiffs' lawful challenge and fails to properly interpret Title I in conformity with the Act's intended purpose. We reverse and remand with directions to grant certain equitable relief.

## TITLE I AND ITS REGULATIONS

In 1965 Congress recognized that there were over five million children living in families whose income was less than $2,000 a year.[3] The adverse poverty of these children was found to lead directly to educational neglect resulting oftentimes in human frustration, delinquency and crime. Congress further realized that the impact of poverty and financial hardship was not confined solely to public school children. Consequently, when Title I was drafted Congress expressly required the inclusion of non-public school children by conditioning any grant upon the proviso that:

> "There is no evidence in this case that the local school boards have refused to consult with nonpublic school authorities in preparing their applications for Title I funds. Similarly, there is no evidence that any applications for Title I funds on an equitable basis for nonpublic school students have been denied at the local or state level except those requesting salaried teachers in the nonpublic school."

3. It has recently been projected that with the raising of the income ceiling there are now over 20 million children qualified under Title I. See note 12 infra.

4. The present statute, 20 U.S.C. § 241e, reads in part:
"(a) A local educational agency may receive a grant under this part for any fiscal year only upon application therefor approved by the appropriate State educational agency, upon its determination (consistent with such basic criteria as the Commissioner may establish)—
"(1) that payments under this part will be used for programs and projects (including the acquisition of equipment, and, where necessary, the construction of school facilities and plans made or to be made for such programs, projects, and facilities) (A) which are designed to meet the special educational needs of educationally deprived children in school

"[T]o the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency has made provisions for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate . . . ." 20 U.S.C. § 241e(a)(2) (1972).

The Act made it the strict responsibility of the local educational agency to plan and administer programs that would meet the particularized needs of all educationally disadvantaged children.[4]

Thus, the undisputed purpose of Title I was to benefit the educationally deprived child whether attending a public or a non-public school.[5]

Upon passage of the Act the United States Commissioner of Education pro-

attendance areas having high concentrations of children from low-income families and (B) which are of sufficient size, scope, and quality to give reasonable promise of substantial progress toward meeting those needs . . . ."
The procedure for determining the funds payable to a local school district includes both public and private school children and is presently calculated according to the following formula:
$a/2 \times b =$ Dollars payable to local school district
$a =$ Average expenditure per pupil in the state
$b =$ Number of children age 5–17 coming from families with annual incomes of less than $3,000 ($4,000 for fiscal year ending June 30, 1973).
See 20 U.S.C. § 241c (1972); H.R.Rep. No. 143, 89th Cong., 1st Sess. 3 (1965).

5. As both the Senate and House Reports state, the Act anticipates "broadened instructional offerings under publicly sponsored auspices which will be available to elementary and secondary school students who are not enrolled in public schools." S.Rep. No. 146, 89th Cong., 1st Sess. 12 (1965) U.S.Code Cong. & Admin.News, p. 1457. See also H.R.Rep. No. 143, 89th Cong., 1st Sess. 7 (1965). This "child benefit theory" was, therefore, one of the basic premises supporting the enactment of Title I. See generally

vided by detailed regulation that educationally deprived children in private schools be afforded "genuine opportunities" to participate in Title I programs "comparable" to the programs available in public schools.[6] In March, 1968, the Commissioner set out revised criteria for the approval of Title I applications based upon the law and the existing regulations which stated:

"The applicant's assessment of needs of children at various grade and age levels must include the children in the

111 Cong.Rec. 5743, 5756–5758, 7309 (1965) (remarks of Representatives Perkins and Carey and Senator Morse). Similarly Title II of the ESEA provides all school children with text books and other instructional services and materials. Other provisions of the Act, Titles III, IV and V, provide direct aid to public school authorities for model programs, for research and for grants designed to strengthen the state departments of education.

6. Section 116.19 of the regulations states in part:

"(a) Each local education agency shall provide special educational services designed to meet the special educational needs of educationally deprived children residing in its district who are enrolled in private schools. Such educationally deprived children shall be provided genuine opportunities to participate therein consistent with the number of such educationally deprived children and the nature and extent of their educational deprivation. The special educational services shall be provided through such arrangements as dual·enrollment, educational radio and television, and mobile educational services and equipment. . . .

"(b) The needs of educationally deprived children enrolled in private schools, the number of such children who will participate in the program and the types of special educational services to be provided for them, shall be determined, after consultation with persons knowledgeable of the needs of these private school children, on a basis comparable to that used in providing for the participation in the program by educationally deprived children enrolled in public schools.

"(c) The opportunities for participation by educationally deprived children in private schools in the program of a

eligible public school attendance areas who are enrolled in private schools. This assessment is to be carried out in consultation with private school authorities and to provide the basis for (a) determining the special services in which private school children will have genuine opportunities to participate, and (b) selecting the private school children for whom such services are to be provided.

"The needs of private school children in the eligible areas may require dif-

local educational agency under Title I of the Act shall be provided through projects of the local educational agency which furnish special educational services that meet the special educational needs of such educationally deprived children rather than the needs of the student body at large or of children in a specified grade. . . .

"(d) Any project to be carried out in public facilities and involving a joint participation of children enrolled in private schools and children enrolled in public schools shall include such provisions as are necessary to avoid classes which are separated by school enrollment or religious affiliation of the children.

"(e) Public school personnel may be made available on other than public school facilities only to the extent necessary to provide special services (such as therapeutic, remedial, or welfare services, broadened health services, school breakfasts for poor children, and guidance and counseling services) for those educationally deprived children for whose needs such special services were designed and only when such services are not normally provided by the private school. The application for a project including such special services shall provide assurance that the applicant will maintain administrative direction and control over those services. . . . Provisions for special educational services for educationally deprived children enrolled in private schools shall not include the paying of salaries for teachers or other employees of private schools, except for services performed outside their regular hours of duty and under public supervision and control, nor shall they include the using of equipment other than mobile or portable equipment on private school premises or the constructing of private school facilities." 45 C.F.R. § 116.19 (1972).

ferent services and activities. *Those services and activities, however, must be comparable in quality, scope, and opportunity for participation to those provided for public school children with needs of equally high priority.* 'Comparability' of services should be attained in terms of the numbers of educationally deprived children in the project area in both public and private schools and related to their specific needs, which in turn should produce an equitable sharing of Title I resources by both groups of children." Commission of Education, Title I Program Guide No. 44, 4.5 (1968).[7] (Emphasis ours.)

▌ We think it clear that the Act and the regulations require a program for educationally deprived non-public school children that is comparable in quality, scope and opportunity, which may or may not necessarily be equal in dollar expenditures to that provided in the public schools. Although the district court originally phrased the issue in terms of "quality, scope and opportunity," it nevertheless based its opinion on an "equitable" funds standard. We, therefore, find the district court's ruling to be erroneous in holding that the use of Title I funds by the Missouri Board of Education meets proper standards and find that plaintiffs are entitled to equitable relief.

## TITLE I IN MISSOURI

In the Kansas City, Missouri, school district where the plaintiffs reside, approximately 11,000 elementary and secondary students are eligible for Title I programs. Because of the limited funding and the wide disbursement of children, only about 7,000 public school pupils were enrolled in Title I programs.

The number of educationally disadvantaged children in the five principal private schools in Kansas City was estimated at 355 (4.72 per cent of the 7,000 public school pupils receiving aid). These figures for the non-public schools are only estimates because (1) the income and the personal records of private school parents were not readily available to the public schools; (2) the non-public schools were not centrally organized and had to be dealt with separately; and (3) the public and non-public school officials notoriously failed to cooperate among themselves.

Almost the entire Title I program in Kansas City is devoted to remedial reading taught in the public schools during the regular school day for disadvantaged public school children only. Outside of equipment and materials provided to the private schools, the one program available under public school auspices for educationally disadvantaged non-public school children was a summer school remedial reading class. In the summer of 1971 approximately 112 private school children and 2,500 public school children participated. With this experience both the public school and private school officials admitted at trial that summer school was a poor substitute for regular day school classes.

The Kansas City public schools have set a $250 per pupil guideline for Title I assistance which under present funding would allow for approximately 8,050 participants. The largest share of the Title I appropriations (approximately 65 per cent) is spent on teachers and teacher aids. About twenty teachers and 130 to 150 teacher aids are presently employed in eighteen elementary and four secondary schools in Kansas City. On several occasions in recent years the non-public

7. This guideline is presumably based in part on Section 116.18(a) of the regulations which reads:

"(a) Each application by a State or local educational agency for a grant (other than one for a planning project) must propose projects of sufficient size, scope and quality as to give reasonable promise of substantial progress toward meeting the needs of educationally deprived children for whom the projects are intended." 45 C.F.R. § 116.18(a) (1972).
See also 20 U.S.C. § 241e(a)(1) (1972); 45 C.F.R. § 116.19 (1972).

schools have requested teachers and teacher aids to come to the private school and teach special remedial classes during part of the regular school day. All such requests have been denied by the public school officials, and the private schools have not, as yet, requested any other assistance except equipment and materials. As a consequence the disparity in Kansas City between expenditures for private and public school children in Title I has been $50 as compared to $275. Recently the public school officials have given the non-public school children their "equitable" share of funds all in monies for equipment and materials.

The practice in Missouri as a whole in prior years has been to give comparable equipment, materials and supplies to eligible private school children, but to exclude any sharing whatsoever of personnel services. Most Title I public school programs in Missouri involve remedial reading, speech therapy and special mathematics classes, thus the largest proportion of the cost of these projects involves salaries for teachers and teacher aids. After the first two years of Title I, expenditures in Missouri for instructional personnel have run from 65 per cent to 70 per cent of the total grant. The remaining funds are used for equipment and materials, health and counseling services, transportation, and plant maintenance. One difficulty with providing only equipment and materials is that even minimal sharing of expenses for equipment and materials soon reaches a saturation point; in fact, the state guidelines permit only 15 per cent of any appropriation to be spent on equipment and instructional materials. The result of this plan for the deprived private school child has been to create a disparity in expenditures in many school districts ranging from approximately $10 to $85 approved for the educationally disadvantaged private school child to approximately $210 to $275 allocated for the deprived public school child.[8] From

8. Title I programming within Missouri school districts flagrantly breaches the state commissioner's own statement of policy as revised in March of 1971 which reads in part (emphasis their own):

"The following procedure should be used in determining the private school participation in Title I activities:

"1. Determine the special educational needs of *all* educationally deprived children residing in eligible Title I attendance areas in the public school district. At least one objective measurement must be used in making this determination. Subjective measurements may also be used.

"2. Determine the *most pressing* special educational needs of *all* educationally deprived children residing in eligible Title I attendance areas in the school districts. . . .

"3. Develop a program that will meet the most pressing special educational needs of *all* educationally deprived children residing in the school district. This is the responsibility of the local public school district *after* consultation with persons knowledgeable of the needs of the private school pupils. The *same level* of *educational deprivation* should be used for determining eligible private school children as is used for determining eligible public school children.

"4. Determine the extent of pupil participation in the Title I, ESEA, program that Title I, ESEA, funds will allow. Private school pupils are entitled to receive the same consideration as public school pupils. This does not mean that private school pupils will necessarily engage in the same activities as public school pupils. Title I Federal Regulations and Missouri State Law restrict the activities for which Title I funds may be expended.

"5. Services for private school pupils participating in the Title I program must be comparable in quality and scope to those provided public school pupils participating in the program if the nature and extent of educational deprivation and the special educational needs are the same.

"9. Title I, ESEA, funds must be used to supplement and not supplant private school funds.

"11. Projects conducted in private schools must be of sufficient size, scope and quality.

"12. The average cost per pupil enrolled in a private school and participating in a Title I, ESEA, program and the average cost per pupil enrolled in a public school and participating

the facts presented the trial court itself recognized that Missouri's "interpretation of Title I has resulted in an undoubtedly inequitable expenditure of Title I funds between educationally deprived children in public and nonpublic schools in some local school districts in the state."

A few school districts in Missouri have attempted to remedy this disparity by providing, in addition to the projects conducted during regular school hours for deprived public school children, Title I programs in the public schools which are open to all educationally deprived children after regular school hours and in the summer. The opinion held by most educators was that these programs were not nearly as successful as the programs conducted during the regular school hours for public school children. The evaluation specialist of the Kansas City School District, Edmund Downey, and the principal of a parochial school in Kansas City, Sister Agnes Marie Hagen, testified that in their opinion, even with these attempts at giving assistance, disadvantaged non-public school children in Kansas City were not receiving comparable educational services under Title I.[9]

in a Title I, ESEA, program will be used as a guide in making State Department of Education approval. If the variance is greater than 10 per cent (more or less) justification will be requested before making approval." Missouri Department of Education, Policy No. 2, Participation of Private School Children in Title I Activities (1971).

The variance in average cost per pupil for public and private Title I recipients in Missouri far exceeds the state's own 10 per cent guidelines.

9. The Missouri State Coordinator of the Elementary and Secondary Education Act referred in his testimony to a letter Missouri received from the United States Commissioner of Education informing the state that the St. Louis, Kansas City and Cape Girardeau programs did not comply with the regulations regarding the participation of private school children in Title I projects.

## COMPARABILITY

■■ There are practical as well as legal considerations when assessing the qualitative scope of a "comparable" Title I program for deprived private school children. For example, in Kansas City the estimated 355 non-public school students who qualify for aid under Title I are scattered throughout five elementary and secondary schools. Obviously the same type of remedial help cannot be programmed for an extremely small number of needy children located in a private school as can be instituted in a public school where a large number of children may be reached. Furthermore, there are many Title I programs which can be utilized in public schools which would not be constitutionally permissible on private school premises. For example, using Title I funds to reduce the general pupil-teacher ratio is permissible in a public school within a low-income area but constitutionally impermissible in a similarly situated private school. However, this concern misses the Congressional mark since Title I programming contemplates for the private pupil only *special educational services and arrangements . . . in which such children can participate."* [10] Thus, cam-

10. 20 U.S.C. § 241e(a)(2) (1972) (Emphasis ours). See the remarks of Representatives Carey and Perkins, the manager of the House Bill, during House debates where they emphasize the importance of the word "special:"
"Mr. GOODELL . . . . If the public school officials with Federal money wish to put a public school teacher in a private school to teach any subject, I would like to have a clear legislative history as to whether it is permitted in this bill.
"Mr. CAREY. If the gentleman phrases his question 'any subject,' the answer would be 'No,' because that would include all subjects.
"Mr. GOODELL. What subjects then would be permitted?
"Mr. CAREY. 'Special' is the key word. The gentleman knows that the word 'special' is in the bill. These are special instructional services. Those that are special are not general. . . .
What is special would be determined by pedagogy.

parability in size, scope and opportunity cannot necessarily be measured in terms of total similarity. It is only in the area of "special . . . services" where the program need be comparable, provided it is determined by the local educational agency that the needs of the children are similar. Furthermore, it is inaccurate to attempt to equate Title I programs on a "fair-sharing" basis which requires an equivalent pro-rata distribution of funds among public and private school students. Fair-sharing of funds is not the intent of Title I.[11] When appraising what is equitable and comparable, the dollar amount allocated can serve only as an indicia of compliance or noncompliance. In fact, recent federal guidelines allow a greater amount of Title I funds to be spent on school areas with higher concentrations of children from low-income families in order to obtain the maximum effect.[12]

The grant of Title I funds is based solely upon the "need . . . determined" of the individual child. Consequently some children may require speech therapy or special instruction in the English language [13] whereas others may demonstrate no particular need at

"Mr. GOODELL. . . . I would like to ask the gentleman from Kentucky if that is his answer, just as a matter of getting the legislative history.

"Mr. PERKINS. The gentleman has answered the question very clearly.

.    .    .    .    .

"Mr. PERKINS. My answer is no as to providing any teaching services to a private institution. The key here is the extension of special educational services to deprived children under public auspices and arranged for, supervised and controlled by, public authority."
111 Cong.Rec. 5747–5748 (1965).

11. In 1969, the National Advisory Council on the Education of Disadvantaged Children, which reports to the President and Congress each year on the progress of Title I, found:
"[S]ome of the nonpublic school officials interviewed, unhappy at the relatively low level of participation by disadvantaged pupils enrolled in their schools, spoke repeatedly of not receiving their 'fair share' of the city's Title I funds; occasionally they mentioned a 'fair share' percentage coinciding with the percentage of nonpublic school children in the city. Of course, the law intends no such 'sharing' or division of funds. Further, the number of disadvantaged nonpublic school children was not proportionate to the number of disadvantaged public school children in any city in the present study. The phrase 'fair share' as used above may be convenient shorthand, but such usage is inconsistent with the intent of the law." National Advisory Council on the Education of Disadvantaged Children, Annual Report to the President and the Congress 38 (1969).

12. As the National Advisory Council on the Education of Disadvantaged Children stated in its letter to the President and the Congress on March 31, 1972:
"The Council notes that title I is now serving 7.5 million disadvantaged children, 1.5 million fewer than in 1969. This decrease is due to the concentration guideline, which directs Local Education Agencies (LEA's) to spend more on fewer children for maximum impact.
"The most recent study which records the number of children living in school attendance areas with high concentrations of children from low-income families (the determining factor of eligibility for title I service) states that *20 million children* are living in these attendance areas.
"This would suggest that approximately two-thirds of the children needing the extra services of compensatory education are not receiving title I services. The Council asks that you carefully consider this fact, and that neither the Executive nor the Legislative Branch of the Federal Government view with complacency the need to serve additional disadvantaged children." National Advisory Council on the Education of Disadvantaged Children, Annual Report to the President and the Congress iii (1972).

13. The record discloses that *Our Lady of the Americas* school, a parochial school in Kansas City, has a student body that is 98 per cent Mexican-American with approximately 175 students eligible for Title I. These children are confronted with a language and cultural problem which must be overcome before they can ever be expected to understand and accomplish

all. This need factor may vary between educationally disadvantaged public school children as well as between deprived public and private school children.[14]

■ The analysis of whether the program within the private school is comparable to the public school program lends itself more to the definition of what is not comparable rather than what is.[15] It is not a comparable program where the need for remedial services of the educationally deprived private school pupil is at least equal to that of the educationally deprived public school student and the only service provided to the private school child is the furnishing of equipment. It is not a comparable program to provide only after-hour and summer remedial instruction on neutral sites which are open to the needy private school child while offering the same services during regular school hours for deprived public school pupils, especially when the partial expense for transportation must be borne by the private school child who comes from a low-income family.[16] Of equal or greater significance is the fact that educational authorities believe such programs do not provide equivalent benefits nor do they successfully reach a significant number of the eligible students. Once the need of *all* qualified students is determined, the state or local educational agency must then show some reasonable justification, within the defined purposes of the regulations and

the Act, for denying comparable services to eligible private school pupils. No showing has been made here.

## APPLICABILITY OF STATE LAW UNDER TITLE I

The gross justification presented by the defendants for the dissimilarity of programs under Title I is that Missouri state law does not allow any shared or dual-time programs whereby the non-public school student can be brought into the public school during regular school hours to receive specialized instruction. Furthermore, the defendants argue that Missouri constitutional law, as well as the Constitution of the United States, prohibit the use of public teachers on private school premises. The defendants urge additionally that Title I does not contemplate the assignment of Title I teachers to non-public schools during the regular school hours. It is, therefore, contended that the only means by which non-public school students can receive teacher services under Title I is through the operation of some after-hour and summer instructional training.

■ The trial court agreed with the defendants' contention that the Act does not permit the assignment of public school teachers to non-public schools. Presumably the court's conclusion was drawn from the Senate House Reports which declare that the Act does not authorize funds for the payment of private school teachers. See S.Rep.No.146, 89th

---

the prescribed studies for each grade. A program designed to meet the needs of these eligible non-public school students might necessarily require a different focus of attention resulting in less *or even greater expenditures.*

14. Disparate allocations of funds may arise because the concentration of eligible children is frequently confined to certain geographic areas. Furthermore, the needs of qualified students may differ because of nationality or cultural backgrounds or because the local school district already has provided effective remedial aid to needy children. Sometimes disparity in allocation may arise where the local agency has failed to request sufficient

funds or the private or public school has failed adequately to evaluate or report the eligible children and their needs.

15. The late Professor Cahn wrote that justice is best defined by considering what injustice is. Cahn, Confronting Injustice 10 (1966).

16. The Missouri Constitution prevents the use of state funds for busing non-public school children, at least to the extent they are transported to and from the private school. See McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 (1953). This objection cannot apply to children transported under Title I funds for instructional training. See discussion, infra at 1351–1353.

Cong., 1st Sess. 11 (1965); H.R.Rep. No.143, 89th Cong., 1st Sess. 7 (1965). However, plaintiffs make no claim that Title I funds should be paid to private school teachers nor do they argue that public school teachers should be assigned to non-public schools for the teaching of general secular classes. They readily concede that such an application of Title I funds would be a violation of the First Amendment. See generally Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Americans United for Separation of Church and State v. Oakey, 339 F.Supp. 545 (D.Vt. 1972); cf. Wolman v. Essex, 342 F. Supp. 399 (S.D.Ohio 1972), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972); Johnson v. Sanders, 319 F. Supp. 421 (D.Conn.1970), aff'd, 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971). And, of course, Title I must be read as comporting with constitutional requirements. See generally Communications Ass'n v. Douds, 339 U.S. 382, 407, 70 S.Ct. 674, 94 L.Ed. 925 (1950); United States v. C.I.O., 335 U.S. 106, 120–121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); cf. Singer Sewing Machine Company v. Brickell, 233 U.S. 304, 313, 34 S.Ct. 493, 58 L.Ed. 974 (1914); Port Construction Co. v. Government of the Virgin Islands, 359 F.2d 663 (3 Cir. 1966). The district court overlooks, however, that the Senate Report does consider the use of public school teachers in the private school for restricted purposes:

"It is anticipated, however, that public school teachers will be made available to other than public school facilities only to provide specialized services which contribute particularly to meeting the special educational needs of educationally deprived children (such as therapeutic, remedial or welfare services) and only where such specialized services are not normally provided by the nonpublic school." S. Rep.No.146, 89th Cong., 1st Sess. 12 (1965), U.S.Code Cong. & Admin. News, p. 1457.

The Senate and House debates also demonstrate that this limited use of public school teachers for specialized services was foreseen and intended by the managers of the Bill. 111 Cong.Rec. 5746–5748, 5758, 5979, 7309 (1965). Therefore, we find the district court's interpretation of Title I as involving a broad proscription of public teacher services in the private schools to be in error.

We come then to defendants' contention that this use of public school teachers in private schools is in violation of Missouri state law. In Special District v. Wheeler, 408 S.W.2d 60 (1966) (Judges Finch and Hyde dissenting on the dual-time holding), the Missouri Supreme Court specifically banned dual-time as a means of carrying out joint instructional programs for public and non-public school children.[17] The court held that the Missouri compulsory attendance law requires each child to remain in his regularly assigned school for a minimum of six hours.[18] In the *Wheeler* case the Missouri Supreme Court was also faced with the practice of public school teachers providing speech therapy for non-public school children on the private school premises. The Missouri court found this practice violated the Missouri Constitution by us-

17. Compare State ex rel. School District v. Nebraska State Board of Education, 188 Neb. 1, 195 N.W.2d 161 (1972), cert. denied, 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed.2d 182 (1972) (see opinions of Justices Douglas and Brennan in denial of certiorari.)

18. In the states where dual enrollment programs have been conducted, the United States Commissioner of Education has found that teacher services are provided under Title I in a comparable and equitable manner. Title I specifically offers this method as one of the alternatives for complying with the Act, 20 U.S.C. § 241e(a)(2), and as the Commissioner has pointed out, this is one of the most feasible ways to achieve compliance. See generally La Noue, Church-State Problems in New Jersey: The Implementation of Title I (ESEA) in Sixty Cities, 22 Rutgers L.Rev. 219, 252 (1968).

ing public school funds for the education of private school pupils in derogation of the constitutional requirement that public funds "belonging to or donated to any state fund for public school purposes" be used for "establishing and maintaining free public schools, and for no other uses or purposes whatsoever." Mo.Const. art. IX, § 5.[19] Thus, dual enrollment is presently unlawful in Missouri by statutory interpretation, and the use of "public monies" for sending public teachers into private schools for specialized instruction has been forbidden by state constitutional provisions.

After the *Wheeler* decision the Missouri State Board of Education promulgated two regulations relating to programs to be administered by local agencies under Title I. They read as follows:

(a) ". . . . Therefore, shared time or dual enrollment between public and nonpublic schools would not be in conformity with state law. Programs operated in the public school for all children after regular school hours, on Saturday, and during the summer after close of the regular school term would be in conformity with state law."

(b) "Special educational services and arrangements, including broad-

ened instructional offerings made available to children in private schools, shall be provided at public facilities. Public school personnel shall not be made available in private facilities. This does not prevent the inclusion in a project of special educational arrangements to provide educational radio and television to students at private schools."

The state board has interpreted the proscription of public monies in the Missouri Constitution under the *Wheeler* decision and has thus concluded that Title I funds are also state public funds to be similarly proscribed. As a result of the board's regulations the local school districts have denied requests of non-public schools for the services of public school teachers in providing remedial training to their educationally disadvantaged children.

Although dual enrollment has been precluded under Missouri law, except for the state board's regulations, the crucial question of whether the Missouri Constitution prohibits the use of *all* funds, regardless of the source, for sending public school teachers into the private schools for specialized programs has not been decided. The Missouri Attorney General for one has publicly disagreed with the State Board of Education's interpretation of the law.[20]

---

19. See also Mo.Const. art. I, § 7; art. IX, § 8, V.A.M.S.

20. In an opinion written in January, 1970, the Missouri Attorney General stated:
"[F]ederal funds, not state funds or State Public School Fund moneys, will pay the teachers for services rendered in making certain services under the Title I Program available on the premises of a private school. The essential character of these funds is not changed from federal to state funds by the mere fact that the Missouri Legislature 'appropriates' them to the State Board of Education. The appropriation comes neither from 'General Revenue' (see for instance § 2.060, House Bill No. 2, Seventy-fifth General Assembly) nor from the 'State School Moneys Fund' (see for instance § 2.200, House Bill No. 2, Seventy-fifth General

Assembly). These funds are appropriated on an open end basis from 'Federal Funds.'

"We do not believe that an appropriation of this type converts federal aid into state aid, thereby making it subject to the Missouri constitutional provisions referred to above.

"It is the opinion of this office that the Elementary and Secondary Education Act of 1965 provides that, under certain circumstances and to the extent necessary, public school personnel, paid with federal funds pursuant to this program, may be made available on the premises of private schools to provide certain special services to eligible children and that Missouri law would not prevent public school personnel, paid with federal funds, from providing

Plaintiffs discount the applicability of state law by asserting that since Title I is a federal act and since there exists a conflict between federal and state law, the supremacy requirements dictate that federal law controls, citing Townsend v. Swank, 404 U.S. 282, 286, 92 S. Ct. 502, 30 L.Ed.2d 448 (1971); Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Brown & Bartlett v. United States, 330 F.2d 692 (6 Cir. 1964); Matcovich v. Anglim, 134 F.2d 834 (9 Cir. 1943). This approach, however, substantially ignores the legislative history of Title I which establishes that state policy and law shall govern the administration of these programs.[21] Moreover, Congress has emphatically declared in the act that federal control of programming, instruction and curriculum was prohibited,[22] and the Commissioner of Education has continually recognized that the grants under Title I must accommodate state law.[23]

Although state law is to be accommodated, the issue of whether Title I funds are state monies or federal funds

these services on the premises of a private school." Op.Atty.Gen. No. 26, 7-9 (1970).
See also In Re Proposal C, 384 Mich. 390, 185 N.W.2d 9, 22-24 (1971).

21. 111 Cong.Rec. 5743-5744, 5746, 5757-5758, 5979, 7623 (1965). See also Hearings on S. 370 Before the Subcomm. on Education of the Senate Comm. on Labor & Public Welfare, 89th Cong., 1st Sess., pt. 1, at 516, 518 (1965).

22. Section 604 of the ESEA, Pub.L. No. 89-10, 79 Stat. 27, 57 (April 11, 1965), states:
"Nothing contained in this Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system."
See 20 U.S.C. § 242(a).

23. The Commissioner of Education's Handbook for State and Local School Officials sets forth the following discourse:
*"State Constitutions and Statutes*
"Many State departments of education found severe restrictions with respect to the kind of services that their respective State constitutions and statutes allowed them *to provide to private school stu-* dents, especially when those private schools were owned and operated by religious groups.
"The following list illustrates the kind of prohibitions encountered when State constitutions and laws are applied to Title I. The list is not exhaustive.
* Dual enrollment may not be allowed.
* Public school personnel may not perform services on private school premises.
* Equipment may not be loaned for use on private school premises.
* Books may not be loaned for use on private school premises.
* Transportation may not be provided to private school students.
Sometimes such prohibitions exist singly in a given State. Often, the prohibitions exist in combination.
"When ESEA was passed in 1965, each State submitted an assurance to the U. S. Office of Education in which the State department of education stated its intention to comply with Title I and its regulations, and the State attorney general declared that the State board of education had the authority, under State law, to perform the duties and functions of Title I as required by the Federal law and its regulations. While State constitutions, laws, and their interpretations limit the options available to provide services to private school students, this fact, in itself, does not relieve the State educational agency of its responsibility to approve only those Title I applications which meet the requirements set forth in the Federal law and regulations.
"A number of school officials realized that they could not submit the required assurance because of the restrictions applying to private school students which were operative in their States. The impasse was successfully resolved in one case by a State attorney general's opinion which held that State restrictions were not applicable to 100 percent federally financed programs. [New York]
"Other States have proposed legislation which would allow the SEA to administer Title I according to the Fed-

must necessarily be decided by federal law. Cf. United States v. 93.970 Acres, 360 U.S. 328, 332–333, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959), and cases cited therein; Enochs v. Smith, 359 F.2d 924, 926 (5 Cir. 1966). Directly involved here is the interpretation of the funding process under a federal act. The Act itself makes it readily apparent that Title I appropriations are a federal grant made *in trust* to local school agencies within a state for the direct benefit of the educationally disadvantaged child. 20 U.S.C. §§ 241e, 241f, 241g (1972). The funds are not to be commingled with other "public funds" (45 C.F.R. § 116.24), and they are not to supplement funds that are already used for educational purposes in the state. 20 U.S.C. §§ 241c(e), 241g(c) (1972). See also 111 Cong.Rec. 5734, 7299 (1965) (remarks of Representative Perkins and Senator Morse). The *only* control the state board has over such funds is to channel them to the local agencies and to review the programs of the local educational agencies to make certain the programs are consistent with the Act and the Commissioner's regulations. A state cannot pass a law or interpret its own laws to say that a Title I grant is to be considered state funds or public funds

for the maintenance of free schools. To do so would be to violate the spirit and the letter of Title I. It seems clear that Title I, as involved herein, does not provide any state aid or any school aid to the state [24]—it is an act to provide educational services to those who qualify under the Act as educationally disadvantaged children.

This reasoning is not in conflict with the proposition that state law and policy must be accommodated under the administration of Title I. A state could conceivably pass a law that would prohibit the use of *any* Title I funds in a private school. Assuming such a law could overcome equal protection arguments,[25] the net effect would be that the state could not comply with the Title I requirement that comparable services be administered to educationally disadvantaged non-public school children. Under those circumstances, the state would not be entitled to a Title I grant and would have to make the "political" decision of whether to repeal the law or deprive all its educationally disadvantaged children of the economic benefits of the Act. Cf. Rosado v. Wyman, 397 U.S. 397, 420–423, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).[26]

eral requirements. Still others have applied the restrictions of the State to Title I and have relied upon the initiative of school administrators to develop a program that would meet the Federal requirements." HEW, Office of Education, Title I ESEA Participation of Private School Children, A Handbook for State and Local School Officials pt. III, at 19–20 (1971) [hereinafter cited as Office of Education Handbook].

24. Title I of the Higher Education Facilities Act of 1963, 20 U.S.C. §§ 711–721 (1964 ed. & Supp. V), does provide direct aid for construction of buildings and facilities at church-related colleges. This section has been held constitutional. Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

25. Cf. In Re Proposal C, 384 Mich. 390, 185 N.W.2d 9, at 27–30.

26. It would seem axiomatic that programming in the use of Title I funds must

comply with the Act and be consistent with the Commissioner's regulations. The statute makes this clear. See 20 U.S.C. §§ 241e, f (1972). We emphasize that if state law prevents a state or local agency from compliance with Title I, then Title I expenditures cannot be manipulated to comply with state law. This would clearly be a case of the tail wagging the dog. Yet this is in essence what the state educational agency proposes and has been doing. The remedy provided for a state that will not or cannot under its own law allocate federal funds in compliance with the Act and the regulations is to have those funds withheld by the United States Commissioner of Education. See 20 U.S.C. § 241j (1972); 45 C.F.R. § 116.52 (1972).

The 1972 National Advisory Council on the Education of Disadvantaged Children has specifically recommended that the law be enforced against Missouri:

"In order to receive title I funds, the State Attorney General must sign an

We conclude that although the administration of Title I must accommodate state law, Title I funds are federal funds with which state and local educational agencies cannot lawfully provide services for eligible public school children and at the same time deny comparable programs to eligible private school children by simply commingling such funds with proscribed state "public funds." More apropos to our discussion here is the provision within the Missouri Constitution which reads:

> "Money or property may also be received from the United States and be redistributed *together with public money of this state* for any public purpose designated by the United States." Mo.Const., art. III, § 38(a). (Emphasis ours.)

Thus, we find that when the need of educationally disadvantaged children requires it, Title I authorizes special teaching services, as contemplated within the Act and regulations, to be furnished by the public agency on private as well as public school premises. In other words, we think it clear that the Act demands that if such special services are furnished public school children, then comparable programs, if needed, must be provided the disadvantaged private school child.

## FEDERAL CONSTITUTIONAL PROBLEM

This then brings us to the defendants' final contention. They urge—all else failing—that public teacher service on private school premises would be unconstitutional under the First Amendment. The defendants rely on Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L. Ed.2d 745 (1971), which held the direct subsidization of private school teachers in Pennsylvania and Rhode Island unconstitutional. Perhaps more closely related to this objection are Wolman v. Essex, 342 F.Supp. 399 (S.D.Ohio 1972), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L. Ed.2d 69 (1972); Americans United for Separation of Church & State v. Oakey, 339 F.Supp. 545 (D.Vt.1972); and Johnson v. Sanders, 319 F.Supp. 421 (D. Conn.1970), aff'd, 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971). Although *Oakey* and *Sanders* would seemingly prohibit the use of public school teachers on private premises to teach general secular subjects, they are not directly controlling as to the suggested teacher service programs under Title I. As we have indicated, Title I contemplates public teacher services on private premises only for "specialized services which contribute particularly to meeting the special educational needs of educationally deprived children (such as therapeutic, remedial or welfare services) and only where such specialized services are not normally provided by the nonpublic school." [27]

██ Although we find these cases not *directly* controlling, we determine that it would be improper for us to pass on the constitutionality of an abstract program of remedial teaching services which is

assurance to the U.S. Commissioner of Education stating that all title I regulations will be observed, even if they conflict with State law. Yet with respect to three States—Missouri, Nebraska, and Oklahoma—the Office of Education is aware of noncompliance with the regulations, section 116.19, on service to children enrolled in non-public schools, and no enforcement action has been initiated.

> "*The Council recommends that any State which is not in compliance with section 116.19 be informed of the Commissioner's intention to enforce the law by the end of fiscal year 1972.*" National Advisory Council on the Education of Disadvantaged Children, Annual Report to the President and the Congress 29 (1972). (Emphasis theirs.)

27. S.Rep.No.146, 89th Cong., 1st Sess. 12 (1965). See also 111 Cong.Rec. 5747–5749, 5758, 5979 (1965); 45 C.F.R. § 116.19(a), (e) (1972). The Commissioner's Handbook for State and Local School Officials recognizes this when it observes:

> "Most of the restrictions or prohibitions which apply to services for private school children refer to the manner in which the services are delivered. . . . The restrictions or prohibitions are:
> 1. The services provided with Title I funds must meet the needs of education-

not properly before us. In doing so, we appreciate the constitutional question remains, but as a reviewing court, we must refrain from passing upon important constitutional questions on an abstract or hypothetical basis. Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 284, 89 S.Ct. 518, 21 L.Ed.2d 174 (1969); Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461–462, 65 S.Ct. 1384, 89 L. Ed. 1725 (1945); Housing Authority of the City of Omaha v. U. S. Housing Authority, 468 F.2d 1, 10 (8 Cir. 1972), cert. denied 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). This is what we would be doing if we decided this issue now.

■ We further observe that no particular program, curriculum or service is *mandatory* under the Act. S.Rep.

No. 146, 89th Cong., 1st Sess. 11 (1965); 111 Cong.Rec. 7298 (1965) (remarks by Senator Morse). A local educational agency may request Title I funds for a variety of uses,[28] and none of these specific remedial programs are now before us. For now we can only assume that the United States Commissioner of Education will approve funds for only those local educational agency programs which comport with Title I and the Constitution of the United States. When approval is given or withheld on a specific plan, only then should a court survey the precise program as falling within or without First Amendment boundaries.[29]

■ In conclusion, we find that plaintiffs are entitled to equitable relief in requiring the defendants to comply with Title I through allocation of funds

---

ally deprived children and not the needs of the private school.

2. In any project where private school students participate along with public school students in public facilities, the classes may not be separated according to school or religious affiliation.

3. Public school personnel may perform services on private premises only to the extent necessary to provide special services for the educationally deprived for whose needs the services were designed.

4. The services which may be provided are limited to special services [citing the regulations in Section 116(e), "such as 'therapeutic, remedial, or welfare services, broadened health services, school breakfasts for poor children, and guidance and counseling services.' The list is meant to be illustrative and not exhaustive of the possibilities."] normally not available in the private school. (A service is special if it responds to an identified, special need of the child.)

5. The services provided with Title I funds must always remain under the administrative direction and control of a public agency. These services may not be administered by the private school.

6. Title I funds may not be used to pay the salaries of private school employees.

. . . . .

12. No Title I funds may be used for religious worship or instruction.

13. Work-study assignments may not be made in such a way as to enhance the value of private premises or supplement activities normally financed by the private school.

14. Teacher aids performing services on private premises, as well as those in public schools, must be involved directly in a Title I activity.

15. Title I funds may not be used to contract with a private school to administer a Title I activity."

Office of Education Handbook, supra note 23, at 12–14.

28. See 111 Cong.Rec. 7298–7299 (1965) (remarks of Senator Morse), for an extensive list of possible Title I activities.

29. Many factors would be important: what is the precise program offered; in what manner is the remedial program to be offered; does the program fully contemplate the restrictions set forth by the United States Commissioner (see note 27 supra); where and when is the program to be offered; what equipment and materials are used; who administers and supervises it; and who benefits from it. These factors must be compiled before applying the tripartite analysis in *Lemon* of whether the program (1) has a secular purpose; (2) possesses a principal or primary effect which neither advances nor inhibits religion; and (3) avoids " 'an excessive government entanglement with religion.' " Lemon v. Kurtzman, 403 U.S. at 612–613, 91 S.Ct. at 2111.

to educationally disadvantaged non-public students. The fact that local agencies have failed to request funds for non-public school children or that private schools have not stated their needs is not justification for denial of an equitable and comparable program for eligible private school children. If the state is to participate in Title I programs, the state has the responsibility to seek out the disadvantaged child and discover his needs. 45 C.F.R. § 116.19(b) (1972).

The record here demonstrates that the basic problem in administering Title I in Missouri has been the tenor of non-cooperation by *both* public and non-public officials. Title I is premised and can work only upon a firm foundation of cooperation by both public and non-public officials. The regulations require that the local educational agency determine the need of the educationally deprived children enrolled in the private school, and this is to be done by "consultation with persons knowledgeable of the needs of these private school children." 45 C. F.R. § 116.19(b) (1972). Implementation of this procedure is the primary responsibility of the state and local officials.[30] The record before us is barren of any evidence that non-public school officials in Missouri have been active consultants in Title I planning or evaluation. This flagrantly violates the Act for the net result of this unauthorized conduct is to neglect the only intended beneficiary of the Act—the disadvantaged child.

The case is remanded to the district court with directions to enjoin the defendants from further violation of Title I of ESEA, and it is further ordered that the court retain continuing jurisdiction of the litigation for the purpose of requiring, within reasonable time limits, the imposition and application of guidelines which will comport with Title I and its regulations.[31] Such guidelines

30. The National Advisory Council on the Education of Disadvantaged Children has recommended in the past certain steps which undoubtedly would help implement an effective program for non-public school children. Among its recommendations have been:

"[That the states designate] *in their departments of education, a liaison officer betwen public and nonpublic school officials,* overseeing the participation of nonpublic school children at the local level. Such an individual would remain in close contact with the official serving that function in the Office of Education in Washington. *Similarly, we recommend to local public and non-public school officials that they designate an individual with sufficient time and resources to act as a liaison on Title I participation.*

"[That] *the Office of Education and the states . . . continue to urge the involvement of nonpublic school officials in the planning and evaluation of Title I at the local level.* This effort could be given emphasis by providing space on planning and evaluation forms not only for the signature of nonpublic school officials but also for their comments on various aspects of the Title I program. Similarly, the comments of public

school officials on the problems they have encountered in encouraging nonpublic participation should be invited.

. . . . .

"[*T*]*hat the Office of Education and the states review the means of identifying eligible children and particularly of establishing target areas.* . . .

"[And that where] *services to children justify it, there should be an increase in shared time programs,* joining public and nonpublic school children in common learning experiences. Such mingling is a positive intent of Title I. Yet few localities include shared time in Title I planning. It should be encouraged by disseminating reports of successful programs which incorporate shared time." National Advisory Council on the Education of Disadvantaged Children, Annual Report to the President and the Congress 42–43 (1969).

The National Council singled out the Title I program in Pittsburgh, Pennsylvania, as a model program of success. We have set out the report on the operation of this plan in the Appendix.

31. The Missouri Department of Education regulations as currently phrased will provide a sound basis for supplementation if, and only if, procedural machinery is provided to carry them out. See note 8 supra.

must provide the lawful means and machinery for effectively assuring educationally disadvantaged non-public school children in Missouri participation in a meaningful program as contemplated within the Act which is comparable in size, scope and opportunity to that provided eligible public school children. Such guidelines shall be incorporated into an appropriate injunctive decree by the district court.[32]

Reversed and remanded.

## APPENDIX

### A COMMUNITY CASE STUDY OF NON-PUBLIC SCHOOL CHILDREN AND TITLE I IN PITTSBURGH, PENNSYLVANIA [*]

"Pittsburgh is a heavily industrialized city of 650,000 persons. Figures provided by the school system show 122,000 children in the city, 76,000 enrolled in public schools (62%) and 46,000 in non-public schools (38%). Of these, 17,500 live in Title I project areas; 13,000 are public school children (74%) and 4,500 are private school children (26%). There are no private schools, other than Catholic schools, in the city with children eligible for Title I funds.

"Title I expenditures for City D have been as follows:

| 1966–67 | School year | $2,509,000 |
| 1967 | Summer | 21,000 |
| 1967–68 | School year | 3,163,000 |
| 1968 | Summer | 53,000 |

"A partial listing of programs for the 1966–67 school year are as follows:

| Instructional Activity | Number of Public-School Participants | Number of Nonpublic School Participants |
| --- | --- | --- |
| Art | 1459 | 0 |
| English-Reading | 655 | 563 |
| English-Speech | 377 | 712 |
| English-Second Language | 866 | 481 |
| Music | 6258 | 531 |
| Recreation | 118 | 0 |
| | | |
| *Service Activity* | | |
| Guidance-Counseling | 2049 | 1031 |
| Social Work | 348 | 1086 |

### Planning and Evaluation in Pittsburgh

"Even before Title I allocations were announced for the first year of the program's operation, public school officials were meeting with Catholic school leaders to plan joint programs. The leaders of two systems were not strangers to one another; Pittsburgh has had a long history of shared-time programs. For years parochial school students had traveled to nearby public schools to participate in home economics classes and courses in vocational education. The plan agreed upon for Title I programs was based on a mutual understanding of the needs of disadvantaged children in the two school systems.

"Title I project areas were selected on a school-by-school basis in the public system using census and AFDC information. Once an individual public school was selected children in the parochial school in the same neighborhood also qualified, so long as Catholic officials verified the assumption that disadvantaged children attended the school in

32. Although we do not pass on the merits of plaintiffs' claim for accounting and damages, the granting of equitable relief herewith should not be construed as determining plaintiffs' damage claim. Plaintiffs must overcome other legal barriers if they are to prevail in their prayer for damages. One of the most important of which is that Title I does not contemplate that private schools shall necessarily receive a pro rata share of Title I funds allocated to a state for its disadvantaged children. (See also note 14 supra.) We observe that the continuing litigation over

this issue is not apt to be productive and can only result in further friction between the parties. Determination of the present legal conflict now can better lead to a beneficial and cooperative program for all children in Missouri intended to be beneficiaries under the Act. In any event, we direct that the injunctive relief granted herein shall be issued and be effective forthwith.

[*] National Advisory Council on the Education of Disadvantaged Children, Annual Report to the President and the Congress B–8—B–11 (1969).

numbers roughly equivalent to the companion public school. According to public school officials, this system was used because the nonpublic school leaders knew they would be responsible for their decision and would behave accordingly. At the same time, public school officials themselves had more than a passing understanding of the composition of Catholic school populations in Pittsburgh.

"Once the project areas were agreed upon, programs were established with services provided equally to the children in the paired public and parochial schools. Approximately 30 percent of the disadvantaged students in Pittsburgh were enrolled in parochial schools and about 30 percent of the Title I funds were expended on these students. In practical terms this has meant that some remedial teachers spend part of their day in the nonpublic school and part in the public school. Few programs mix students from the two systems.

"In the Communication Skills program, for example, where intensive reading preparation is given, half of the teachers spend half of their time in parochial schools. Thus 25 percent of the total program takes place with nonpublic children. This program is concentrated in 11 public schools, but provides services to children in 30 Catholic schools. In other words, 75 percent of the teachers and equipment are located in a few public schools while 25 percent serve children in numerous parochial schools. This arrangement was pressed by Catholic school officials; those public officials in charge of the program feel that students benefit most from a concentration of services. The U. S. Office of Education, in its guidelines, is explicit in urging such concentration.

"Certain programs, as seen in the listing above, serve only students in public schools, while others serve both in varying proportions. Funds for reducing class size, for example, are not expended for children in parochial schools. Some substitution takes place, however, so that more than 30 percent of the participants in some programs are nonpublic school children.

"According to both Catholic and public schoolmen, evaluation is an on-going process. The deputy superintendent of the Diocese schools and the associate director of compensatory education for the Pittsburgh school system, call one another whenever necessary to discuss Title I programs. Decisions on the retention or expansion for the various components of Title I are discussed at regular joint meetings, occasionally with the public school superintendent in attendance. In one example of what transpires at such gatherings, it was recently proposed by the public school administration that a program involving mobile speech clinics be ended. Parochial officials saw this as undesirable for their children since it would have ended speech therapy in their schools. A compromise finally was reached where one laboratory would be kept to serve nonpublic pupils.

"In part, this joint evaluation is encouraged by a State Department of Education regulation requiring the signature of nonpublic officials on the state evaluation form. This is to insure that consultation with private school leaders has, in fact, taken place. This is a recent regulation, however, and active cooperation was commonplace in Pittsburgh before its enactment.

"Current planning in Pittsburgh includes the establishment of a position within the public school's office of compensatory education to represent the nonpublic schools on a half-time basis. Such a liaison would assist in planning and evaluation and would assure full participation wherever possible. Funds do not presently provide for such an individual, however, and it appears that this plan will not be activated in the immediate future because of the curtailment of Title I funds.

*Discussion*

"Both public and nonpublic school officials take pride in the harmonious relationship between the two systems. A long history of such cooperation is present, enhanced by a state constitution which has long permitted shared-time programs. Title I is being administered in keeping with this spirit to the satisfaction of all the participants involved.

"Programs in the 1967–68 school year, for which evaluations are not ready at the time of this writing, showed that nonpublic participation was occurring at approximately 30 percent, though probably at a slightly reduced level (one estimate was 27.3% total allocation). Individual program descriptions for 1967–68 demonstrated that disadvantaged nonpublic school children have been considered in the planning of each Title I program.

"There is less inter-mingling of public and nonpublic school children students in Title I programs than might be considered desirable by some observers, including some of the original sponsors of Title I legislation. In part this is the result of the convenience and the economy in shifting teaching personnel from school to school, rather than students. Distance is sometimes a factor, as walking is not always possible. Also, there are a number of problems associated with moving a large body of students through crowded urban neighborhoods. Such an effort, however, would lead to a sharing of programs between Pittsburgh public schools, many with large nonwhite populations, and Catholic schools, which tend to be filled with mostly white students.

"The nature of the Catholic school organization fosters cooperation. The Catholic Schools Office is highly centralized and has full support of the Bishop of Pittsburgh. The Schools Office has authority to speak for all parochial schools in the City and the Diocese.

Thus, the public school officials have only one person with whom they must communicate. This is a tremendous advantage and has contributed greatly to the public/nonpublic cooperation. It would be much more difficult to establish such rapport in cities with autonomous Catholic schools.

"On the whole, the situation in Pittsburgh seems to follow closely the letter and spirit of Title I with regard to the provision of services to disadvantaged nonpublic school children. Nonpublic school officials contribute to both planning and evaluation. Aid is given to nonpublic school children but the nature of that aid is such that careful control seems to be exercised by the public school officials. At the same time, because participation in program formulation is invited and because of frequent intercommunication, the non-public officials are in a position to both assist in, and observe, the operation of Title I. Such a situation would seem to provide a sound basis for informed judgment on the part of public officials with whom responsibility for Title I programs ultimately rests. The real benefactor would seem to be the disadvantaged child in Pittsburgh who is receiving aid regardless of the school he attends, as is the intent of Title I."

STEPHENSON, Circuit Judge (dissenting).

I respectfully dissent. Notwithstanding the view expressed in the majority opinion, Title I of the Elementary and Secondary School Act of 1965 clearly *only permits* and does not mandate the assignment of public school teachers to private schools during regular school hours. That no such congressional purpose ever prevailed is evidenced by the Act's legislative history. The bill's floor manager in the House initially expressed the view that a public school teacher could not be assigned to a private school under the provisions of Title I.[1] Fol-

1. See 111 Cong.Rec. 5743-8 (1965) and G. LaNoue, "Church-State Problems in New Jersey: The Implementation of Title I (ESEA) in Sixty Cities," 22 Rutgers L. Rev. 219, 234–235 (1968).

lowing lengthy debate a compromise was carefully reached by which "The decision about the best arrangement for providing special educational assistance under Title I is left to the public education agency of the school district, under the Constitution and laws of the State." 111 Cong.Rec. 5979 (1965).[2] Since the Act is only permissive with respect to school teacher assignments, the Missouri State Board of Education, bound by its state constitution and court decisions, could properly determine not to approve school district plans providing for the assignment of public school teachers to private schools during regular school hours.

I therefore find myself in complete agreement with Judge Collinson's conclusion that:

"Title I clearly does not mandate the assignment of teachers paid by Title I funds to nonpublic schools. The legislative history of the Act demonstrates that such an intention was completely disavowed by every proponent of the bill."

I would therefore affirm the trial court's denial of injunctive relief.

If, as the majority holds, Title I *mandates* the assignment of public school teachers to private schools, I fail to see how the constitutional issue presented can be avoided. I share in the District Judge's grave concern that Title I, under such circumstances, could not withstand the constitutional challenge. See Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1971); Americans United for Separation of Church and State v. Oakey, 339 F.Supp. 545 (D.Vt.1972) and Johnson v. Sanders, 319 F.Supp. 421 (D.Conn.1970), aff'd 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971). The "entanglements" fostered by Title I, as construed by the majority, appear quite indistinguishable from the excessive entanglements proscribed by *Lemon.* See generally, 22 Rutgers L. Rev., *supra.*

I join in the majority's concern with respect to the failure of the parties to negotiate a lawful program pursuant to the Act. Unfortunately, the victims of this lack of cooperation are the intended beneficiaries of Title I, the educationally deprived children.

2. See also, Sen.R.No.146, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Admin.News, pp. 1456–1457.