THE STATE ex rel. L. D. THOMPSON, State Treasurer, v. BOARD OF REGENTS OF NORTHEAST MISSOURI TEACHER'S COLLEGE.

In Banc, July 31, 1924.

1. **STATE MONEY**: Insurance Paid on College Buildings Destroyed by Fire: Payable into State Treasury. Neither Section 43 of Article 4 of the Missouri Constitution, declaring that "all revenue collected and moneys received by the State from any source whatever shall go into the Treasury, and the General Assembly shall have no power to divert the same, or permit money to be drawn from the Treasury, except in pursuance of regular appropriations made by law," nor the supplementary provision found in Section 15 of Article 10, declaring that "all moneys now, or at any time hereafter, in the State Treasury, belonging to the State, shall, immediately on the receipt thereof, be deposited by the Treasurer to the credit of the State for the benefit of the funds to which they respectively belong," requires the board of regents of a state teachers' college to pay into the State Treasury money paid to the board by insurance companies on policies, issued to the board and paid for by tuition fees, in settlement of losses sustained when college buildings were destroyed or damaged by fire, but the board can use such insurance money to restore such buildings.

2. ——: ——: ——: **Revenue.** By revenue as the word is used in the Constitution is meant the current income of the State from whatever source derived which is subject to appropriation for public uses. If required to be paid into the Treasury it becomes revenue or State money.

3. ——: ——: **Instrumentality of State.** In a sense, the board of regents of a state teachers' college represents the State in the performance of its duties, but its powers embody no attributes of sovereignty which would entitle it to be designated as the State's *alter ego*.

4. ——: ——: ——: **Mandamus: Discretion: Tuition Fees: Used to Buy Insurance.** Mandamus was not intended to be invoked simply to demonstrate the existence of the State's power. Its purpose is to remedy rights that lack assistance or wrongs that need resistance. No express authority has been conferred upon the Board of Regents of the Northeast Missouri State Teachers' College to protect its property from loss or destruction by fire. But as an instrumentality of the State it has a reasonable discretion in the

State ex rel. Thompson v. Board of Regents.

exercise of the powers conferred, and in the exercise of that power it has for many years charged students certain fees for junior high school, extension and other work, and the General Assembly has not attempted to regulate the collection or disposition of the fees, and the board, in the exercise of its discretion, has used a part of them when collected to purchase fire insurance on the college buildings, which being destroyed by fire the insurance due was paid by the companies to the board, to which the policies by their terms were payable, and in the further exercise of its discretion the board at once used a part of the money so received in necessary repair of certain damaged buildings and has taken steps to use the rest in the erection of other buildings in place of those destroyed. The board is not charged with wrong-doing or usurpation of power. If the money is paid into the State Treasury, repair and restoration of the buildings must cease until it is appropriated by the General Assembly, and the delay will materially impede the work of the college. No statute requires the money to be paid into the State Treasury. *Held*, that, to pay the money into the State Treasury would serve no beneficial purpose, and mandamus cannot be invoked for the sole purpose of demonstrating the existence of the State's power to demand that it be so paid.

5. ———: ———: **Statutory Classification.** To compel the payment into the State Treasury of money paid to the board of regents of a state teachers' college by insurance companies for losses caused by the damage or destruction by fire of college buildings, a statute classifying it as State money is a prerequisite, and there is no such statute; on the contrary, Section 11505 requires the board to make an annual report of money received "from appropriations, incidental fees and other sources, and the distribution thereof," thereby implying the power of the board to receive and disburse, without covering into the State Treasury, the money so received from insurance companies.

Headnotes 1 and 5: Colleges and Universities: 1, 11 C. J. par. 18; 5, 11, C. J. par. 18 (1926 Anno). Headnote 2: Revenue: 34 Cyc. 1691; Headnote 3: States: 36 Cyc. 869. Headnote 4: Colleges: and Universities, 11 C. J., par. 18 (1926 Anno); Mandamus, 26 Cyc. 146, 148.

*Mandamus.*

WRIT DENIED.

*Jesse W. Barrett,* Attorney-General, and *George W. Crowder,* Assistant Attorney-General, for relator.

(1) If the money here in question belongs to the State, then it should be paid into the State Treasury.

Section 43, Article IV, Mo. Constitution; Sec. 13331, R. S. 1919. (a) If the money should go into the State Treasury it would not have to go into the general fund, nor would twenty-five per cent of it be subject to be appropriated to the public schools. Sec. 12309, R. S. 1919; Sec. 15, Art. 10, Mo. Constitution. (b) Sec. 12310, R. S. 1919, provides that any moneys in the State Treasury to the credit of any of the funds in this article created shall be appropriated by the General Assembly for the support or improvement of the institution to which the fund belongs. (2) The Board was, at its inception, a subordinate governmental agency for the State, with power to take and hold, in the capacity of the State's trustee, the real estate accepted or selected as a college site, and with authority to manage and control the school as the State's governmental agent. No independent, or other relation, can be conceived, or deduced from the law. The duties and powers of the board being purely statutory, can be no larger than is expressly set forth in Art. 17, Ch. 102, R. S. 1919, and as to this there has been no material change since 1870. The history of normal school appropriations since 1870 shows that the buildings were constructed, improvements and repairs made, and equipment furnished by state appropriations, as the same were needed. These normal school districts, unlike public school districts, have no power of local taxation for purposes of maintenance nor for any other purpose. A small entrance fee seems to be exacted from the students, but there is no law expressly authorizing it. If it can be justified at all it is because Sec. 11500, R. S. 1919, with reference to the board's power to make rules and regulations, can be construed as broad enough to include power of levying this fee. The fact that these students' fees, and other fees of a kindred nature, are collected under a rule of the board and in fact applied by it, as unappropriated money, on the incidental expenses of the college, even to making applications on teachers' salaries, does not alter the situation, nor does it aid in properly .

defining the moneys now in dispute. Neither does the fact that the board held the insurance from which this money comes, in its own official name, and paid the premiums thereon out of such fees, serve to take the money here in question out of the category of state moneys. With all these, the fact remains that the source of creation of this school is the State, and its legal and only dependable source of maintenance is the State, without whose biennial appropriations it could not function. If, therefore, the board effected insurance on the buildings it did this for the State. If it paid the premiums, out of unappropriated moneys, from whatever source, this was for the benefit of the State. It follows, that the proceeds of the insurance would necessarily be of the public moneys belonging to the State, the legal repository of which is the State Treasury. All needful things for state teachers' colleges, including ordinary repairs, supplies, and equipment, are required to come through appropriations made by the Legislature, and such is the legislative interpretation and conception of the law. Secs. 12309, 12310, R. S. 1919.

*M. D. Campbell* for respondent.

(1)    Sec. 43, Art. 4, Constitution of Missouri, provides that all ''revenue'' collected and all ''moneys received by the State'' from any source, whatsoever, shall go into the treasury. The proceeds of insurance policies paid to respondent is not revenue within the meaning of said section. State v. Gordon, 266 Mo. 410. The other provision, ''money received by the State,'' of course means money which the State as a sovereign has the right to receive. If the Board of Regents is not the State, then of course the section could not apply to the case at bar. Neither could said section apply unless the proceeds of insurance policies rightfully belong to the State and are the character of fund which the law contemplates shall be paid into the State Treasury.    (2)    The policies of

insurance were payable to respondent. The State could not have maintained an action thereon. The State did not pay the premiums on the policies. The premiums were paid by money received from students' fees, junior high school work, extension work and the like, money which the State never had nor claimed the right to have in its treasury. It has been the practice of respondent since its organization in 1870 to charge students fees and to make collections from other sources, and it has never been called upon to pay any of such sums into the State Treasury. If respondent is the "State" for the purpose of collecting an insurance policy, then why is it not the "State" in the collection of students' fees, extension work, junior high school work and the like? (3) For more than half a century respondent and other like Boards of Teachers Colleges have been collecting large sums of money, in recent years as much as $50,000 per year, which has never been claimed by the State, but has been used by the various colleges for furthering their work. (4) It is not practical nor reasonable to give said section any other construction, even though the board of regents is "the State" within the meaning of said section. Funds such as are involved in this section are not "moneys received by the State" within the meaning of the law. If students' fees, fees for junior high school and extension work, receipts from agricultural school, rural high school and the like received by the board of regents may be expended by them without appropriation by the Legislature, then by what process of reasoning can it be claimed that money received by the board of regents from any source, and which it desires to use to further the work in which the college is engaged, is "money received by the State" and therefore cannot be used to save the life of the institution? (5) Sec. 12312, R. S. 1919, does not apply to teachers colleges. (6) The State has not seen fit in its name to procure insurance on its buildings, has never made an appropriation for that purpose, and yet without ever having paid one dollar of appropriated

money it seeks to take into its treasury a fund which in equity and good conscience should be used to restore the property respondent protected by insurance. (7) . The provisions of said Section 11510 justified this contention. That section provides that all appropriations made by the general assembly for the support of any state teachers' college or for the benefit thereof, and "all grants, gifts, bequests or donations by any individual or corporation for a specified use shall not be applied either wholly or in part to any other use or uses." To use the proceeds of the insurance policies for any purpose other than to restore the damaged and destroyed buildings would be to divert the fund. The duty of the board is to provide proper buildings and equipment, able men and women as instructors, and do all of the things necessary to that end. That it is their duty to conduct the College will of course be conceded; and yet if relator succeeds respondent will be powerless to perform a duty enjoined upon it by law. Having due regard for the opinion of the relator and his counsel, we respectfully suggest that the best that can be said in his behalf is that his right to the fund in question is not clear. "In this court the writ of mandamus is looked upon more or less as a discretionary writ, and even in cases where it could very properly be issued our courts have withheld it because of conditions which did not appeal to sound discretion." State ex rel. v. Reynolds, 243 Mo. 720.

WALKER, J.—This is an original proceeding by mandamus brought by the relator as State Treasurer to compel the respondent as the Board of Regents of the Northeast Missouri Teacher's College to pay certain money into the State Treasury. The issuance of an alternative writ was waived and the return of the respondent was made to the petition as and for the writ.

Baldwin Hall and the Library Building, with their contents, constituting a part of the buildings and property of the said college, were destroyed by fire in January,

State ex rel. Thompson v. Board of Regents.

1924. The board had insured these buildings and their contents and other property of the college against loss and damage by fire; the policies issued were made payable to the board, and the premiums thereon were paid by the board out of unappropriated money in its hands, derived from students' fees for junior high school, extension and other work. This character of funds it had been the custom of the board to collect from the sources named since the creation and organization of the college in 1870 and to expend the same as discretion prompted. The insurance companies, in satisfaction of the losses incurred by the destruction of the buildings named and their contents, paid the board the sum of $110,000, and an additional sum of $7,355.33 for damages to other buildings not destroyed. Upon the receipt of these payments the board proceeded to expend a portion of same amounting to the sum of $26,166.47 for necessary repairs to buildings not entirely destroyed, and in the purchase of books to partially replace the library.

The relator contends that the money received by the board from the insurance companies is, within the meaning of the Constitution and statutes, state money, and should be paid into the State Treasury.

Constitutional and statutory provisions are invoked to sustain this contention. Chiefest among these and that which may be said to constitute a basis for the others is the constitutional provision that all money collected and received by the State from any source whatsoever shall go into the State Treasury. [Sec. 43, Art. IV, Const. Mo.] Supplemental to this section is the further constitutional provision that "all moneys now, or at any time hereafter, in the State Treasury belonging to the State, shall immediately, upon receipt thereof, be deposited by the treasurer to the credit of the State for the benefit of the funds to which they respectively belong" (Sec. 15, Art. X, Const. Mo.); and a statutory provision (Sec. 12309), made applicable by designation to educational and other public institutions, to the effect that: "Whenever any moneys

are paid into the State Treasury under the provisions of this article (Art. VIII, Chap. 111, R. S. 1919), they shall be receipted for by the State Treasurer and placed to the credit of the fund to which they respectively belong, so that money derived from each institution may be placed to the credit of the fund herein provided for that institution." Section 12310 requires the moneys in the State Treasury to the credit of the institutions named in Section 12309 to be appropriated by the General Assembly for the support or improvement of the institution to which the fund belongs. Sections 12311 and 12312, are in express terms, limited in their application to penal and eleemosynary institutions and hence need not be considered.

I. The constitutional provision invoked by relator as the underlying authority for the issuance of this writ is but one of the many restrictions to be found in the Constitution of 1875 concerning the custody and expenditure of the revenue. The moving cause for the incorporation of these restrictions in the Constitution was to put an end to an era of extravagance and waste in the use of the revenue which had prevailed for more than a decade prior thereto—the Constitution of 1865 containing no such limitation as is found in the provision under consideration. This provision, it will be seen from its terms, which are wisely chosen as a limitation upon power, is restricted to "revenue collected and money received by the State from any source whatsoever." By revenue, whether its meaning be measured by the general or the legal lexicographer, is meant the current income of the State from whatsoever source derived which is subject to appropriation for public uses. This current income may be derived from various sources as our numerous statutes attest, but no matter from what source derived, if required to be paid into the Treasury, it becomes revenue or state money; its classification as such being dependent upon specific legislative enactment or, as aptly put by the respondent, state money means money

*Mandamus.*

the State, in its sovereign capacity, is authorized to receive—the source of its authority being the Legislature. With this limitation—and the Constitution itself is but an instrument of limitations—it should be strictly construed. Thus construed the spirit which prompted the adoption of the provision is fully recognized and its purpose is promoted. Unless, therefore, it can be successfully contended in harmony with well recognized rules of interpretation that the Board of Regents of the College is the State and that moneys received by it other than from appropriations is state money, the constitutional provision will afford no support to the relator's contention.

While the board, in a sense, represents the State in the performance of its duties, it is but one of the many necessary instrumentalities through which the former is enabled to act within the scope of the powers conferred by law. These powers embody no attributes of sovereignty which would entitle them to be designated as the State's *alter ego*. While in a sense, the board is an agent of the State with defined powers, the importance of its duties, with their attendant responsibilities, is such as to necessarily clothe the board with a reasonable discretion in the exercise of same. This is inevitably true, first, because of the difficulty in framing a statute with such a regard for particulars as to cover every exigency that may arise in the future; and, second, because a restriction of the board's powers to the letter of the law would destroy its efficiency and to that extent cripple the purpose for which the institution was created. Legislatures, therefore, moved by that wisdom which is born of experience whether conscious or not of that aphorism that "new occasions teach new duties; time makes ancient acts uncouth," have contented themselves with defining in general terms the powers of such boards as are here under review, leaving the discharge of duties not defined and which may, under changed conditions, arise in the future, to the discretion of the board.

305 Mo.—5.

The case at bar which is but one of many in the management of our state institutions is illustrative of this fact. When the college was organized fifty-four years ago, it was evidently not within the contemplation of the framers of the law that the board would receive or be charged with the expenditure of other funds than those appropriated by the Legislature and hence no provision was made in reference thereto. In addition, for what reason it is profitless to discuss, no express power was conferred upon the board to protect the State's property from loss occasioned by fire or other destructive forces. The board, upon the college becoming operative, with the increase in the student body and the extension of its work, deemed it proper to charge students certain fees for junior high school, extension and other work. This custom has continued, not only in this institution but others of like character, during the terms of their respective existences. No criticism has ever been made of same and as proof of its approval no General Assembly during the more than fifty years of this college's operation has sought to either regulate the collection or disposition of the funds thus obtained. The fund arising from such collections has been retained by the board and expended by it for the college. [State ex rel. v. Walker, 240 Mo. l. c. 724.]

Among other expenditures which have been made by the board in the exercise of its discretion is that for insurance upon the buildings and equipment of the college. Lacking express statutory authority for its action the beneficiary named in the policies thus obtained, was the board. When the loss occurred the amounts due under the contract was paid, as it should have been, to the board. In furtherance of its discretion it proceeded at once to expend a portion of the money thus received in repairs necessary for the protection of certain damaged buildings and to partially replace the library. When this writ was served the board was taking steps to replace the destroyed buildings. It is charged with no wrong doing or

the usurpation of any power which has not at least re-ceived tacit legislative and public approval for a half century. These facts are entitled to more than persuasive consideration in determining the question here seeking solution. Absent qualifying incidents they may arise to the dignity of ruling decisions. [State ex rel. v. Gordon, 266 Mo. 412; Folk v. St. Louis, 250 Mo. 141.] The sum of its offending is, that having made a valid contract in the State's interest and for its protection and the fruits of same having been received, that it shall pay this money into the State Treasury instead of using it to partially restore the buildings destroyed, and await legislative action authorizing its use for that purpose. Such a course disregarding the implication which the application for this writ involves as to the integrity and business judgment of the board after its years of experience, is fraught with injury to the college in interfering with its operation and thus lessening its opportunities for the advancement of higher education. The result of the granting of this writ will be to take money out of one of the State's hands and put it in another, which other must remain tightly closed until opened by a legislative sesame. Such a procedure can serve no beneficial purpose and savors of folly. Mandamus was never intended to subserve such an end as is here sought to be accomplished. A drastic writ at best, it is properly invoked to remedy "rights that lack assistance or wrongs that need resistance." It was never intended to be invoked simply to demonstrate the existence of the State's power, which, when thus exercised, cannot be denominated as other than tyranny.

II. In the foregoing discussion of the constitutional provision invoked by relator, we have stated generally that no statute required the payment into the State Treasury of the money here in controversy; and, **Statutory Classification Necessary.** that a statutory enactment was a prerequisite to such payment and its receipt and deposit by the Treasurer to entitle it, under the Constitution, to be classified as state money. A re-

view of the statutes in relation to the State Teacher's Colleges is therefore not inappropriate as confirmatory of this conclusion. These statutes, so far as applicable to the matter here under review are to be found in Chapter 102, Article 17, Revised Statutes 1919, as follows:

Under Section 11491, the board of regents is empowered to sue and be sued, to take, purchase and hold real estate and to sell and otherwise dispose of same. This section invests the board with powers akin to those of a corporation and within the limits defined recognizes the board as a legal entity without in any wise lessening the State's sovereignty.

Sections 11498 and 11500 confer upon the board the entire management of the college, including the right to determine the qualifications of students seeking admission therein.

Section 11505 requires the president of the board to make an annual report each year to the Superintendent of Public Schools of all receipts of money from appropriations, incidental fees and all other sources and the disbursements thereof and for what purpose, and the condition of said college. The terms of this section indicate by reasonable implication the power of the board to hold and disburse without covering into the State Treasury the funds here in question. If, as is contended by relator, all moneys received by the board were required to be paid into the State Treasury the only money that could be disbursed by the board and for which it would have to render an account would be that which had been appropriated for the college by the Legislature. The authorized disbursements of the board are not thus limited by the section which includes ''appropriations, incidental fees and moneys received from all other sources.'' In addition, the board is required to state the purposes for which these disbursements were made. Certainly it cannot, under any rule of construction, be held that a payment into the State Treasury of incidental fees received by the college is in any sense a disbursement. Even the tyro

in the use of our mother tongue, attributes no other meaning to the word than to pay out or expend. A payment into the Treasury, therefore, cannot be so classified, as it simply effects a change in the custodian and the place of deposit of the fund. The correctness of our construction of Section 11505 is further attested by Section 11506 which requires the treasurer of the board to make an itemized statement to the Legislature of the receipts and expenditures of the board showing all disbursements of money received from the State and from other sources. In harmony with the construction given to the foregoing sections in Section 11508, which requires the board at its annual meeting to set apart "all money derived from incidental or other fees paid by students," etc., thus clearly recognizing that the college has funds within its control which were never in the State Treasury nor appropriated by the Legislature.

III.   Much space is devoted in the lucid brief filed by respondent to the non-application to the matter at issue of numerous other sections of the statutes relating to the management of public institutions and the receipt and disbursement of their funds from whatever source derived. Without burdening this opinion with their review, it seems sufficient to say that in none of these statutes, either by express enactment or reasonable implication does it appear that it was within the contemplation or intention of the Legislature that moneys received by the managing boards of educational institutions in the nature of incidental fees should, as a condition precedent to their use by the respective boards, be required to be first paid into the State Treasury and appropriated therefrom by the Legislature. In the absence of a mandatory requirement to that effect no duty is devolved upon such boards to thus dispose of these funds. Their duty in the premises in the presence of that discretion with which the law has clothed them is to expend such funds for the college, and account for same

*Other Statutes.*

in the manner required by the plain provisions of the governing statutes.

No reason existing for the exercise of this court's mandatory power under the facts in this case, the writ is denied. All concur except *White, J.*, absent; *David E. Blair, J.*, concurs in result.