Anna BARRERA, etc., et al.,
Appellants,

v.

Hubert WHEELER, etc., et al., Appellees.

No. 75–1667.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1976.

Decided March 11, 1976.

Thomas M. Sullivan, Kansas City, Mo., for appellants; Edward L. FitzGerald and Eileen S. Sullivan, Kansas City, Mo., and Louis C. DeFeo, Jr., Jefferson City, Mo., on briefs.

Hary D. Dingman, Kansas City, Mo., for appellees.

Before LAY, HEANEY and STE-PHENSON, Circuit Judges.

LAY, Circuit Judge.

This is the third round of an apparently endless legal battle over the allocation of funds to private and public schools in Kansas City, Missouri, under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 241a et seq. (1972).[1] Title I provides federal funding for special programs for educationally deprived children in both public and private schools.[2] This litigation was begun on behalf of parochial school students eligible for Title I benefits. These plaintiffs claimed that the public school authorities had failed to provide parochial school children Title I programs comparable in quality, scope and opportunity to those made available to public school students, in violation of the Act.

---

1. See Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), aff'g, 475 F.2d 1338 (8th Cir. 1973).

2. The Supreme Court has described Title I as follows:

> Title I is the first federal-aid-to-education program authorizing assistance for private school children as well as for public school children. . . .
> Since the Act was designed to be administered by local *public* education officials, a number of problems naturally arise in the delivery of *services to eligible private school* pupils. . . . [T]he primary responsibility for designing and effectuating a Title I program rests with what the Act . . . describe[s] as the "local educational agency." This local agency submits to the "State educational agency" a proposed program designed to meet the special educational needs of educationally deprived children . . . . . In order to receive state approval, the proposed plan . . . must be designed to provide the eligible private school students services that are "comparable in quality, scope, and opportunity for participation to those provided for public school children with needs of equally high priority."

Wheeler v. Barrera, 417 U.S. 402, 405–07, 94 S.Ct. 2274, 2278, 41 L.Ed.2d 159, 166 (1974).

In 1973, this court held that the Title I programs for Kansas City parochial schools were not comparable to those in the public schools. *Barrera v. Wheeler,* 475 F.2d 1338 (8th Cir. 1973). The Supreme Court affirmed our decision in *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974).[3] On remand from the Supreme Court, the district court approved certain guidelines filed by the Missouri Department of Elementary and Secondary Education. Plaintiffs now appeal from that decision, alleging that the guidelines do not comply with the Act and this court's prior mandate.

*Background.*

Before considering the challenge to the guidelines, we find it helpful to review the substance of this litigation and some relevant constitutional developments. The recurring complaint has been that specialized instruction during regular school hours has been denied parochial school children under the Title I programs administered in Missouri. In the public schools, public school teachers provide Title I programs (mainly remedial reading classes) during the regular school day. The Title I funds for private schools have been used only to provide certain equipment and supplies and except for one summer school remedial reading program, there has been no sharing of personnel services.

On the prior appeal, we held:

It is not a comparable program where . . . the only service provided to the private school child is the furnishing of equipment. It is not a comparable program to provide only after-hour and summer remedial instruction on neutral sites . . . to the needy private school child while offering the same services during regular school hours for deprived public school pupils, especially when the partial expense for transportation must be borne by the private school child who comes from a low-income family. . . . [E]ducational authorities believe such programs do not provide equivalent benefits nor do they successfully reach a significant number of the eligible students. Once the need of *all* qualified students is determined, the state or local educational agency must then show some reasonable justification, . . . for denying comparable services to eligible private school pupils. No showing has been made here. 475 F.2d at 1348.

The Supreme Court echoed our observation by saying:

On the facts of this case, petitioners have been approving plans that do not meet this requirement, and certainly, if public school children continue to receive on-the-premises Title I instruction, petitioners should not approve plans that fail to make a genuine effort to employ comparable alternative programs *that make up for the lack of on-the-premises instruction for the nonpublic school children. A program which provides instruction and equipment to the public school children and the same equipment but no instruction to the private school children cannot, on its face, be comparable.* In order to equalize the level and quality of services offered, something must be substituted for the private school children. 417 U.S. at 424–25, 94 S.Ct. at 2287, 41 L.Ed.2d at 176 (emphasis added).

*Constitutional Limitations.*

One of the obvious difficulties facing Title I programs in parochial schools has been the need to avoid church-state entanglement under the Establishment Clause of the First Amendment. We

---

**3.** In affirming our earlier decision, however, the Supreme Court disagreed with our holding that Title I funds were "trust funds" to be administered under federal law rather than state law. The Court held it not necessary to decide that question and further that the question of whether the funds were subject to the prohibitions of the Missouri Constitution was to be determined under state law. *Wheeler v. Barrera,* 417 U.S. 402, 416, 94 S.Ct. 2274, 2283, 41 L.Ed.2d 159, 172 (1974).

previously refused to pass on the constitutionality of the program, as did the Supreme Court, since we were not faced with a specific plan or its application.

When it decided this case, the Supreme Court suggested certain alternatives to be explored by the Missouri Department of Elementary and Secondary Education to ensure comparability of public and private school programs.[4] However, on May 19, 1975, the Supreme Court decided *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), which held certain provisions of Pennsylvania law relating to "auxiliary services" (almost identical in kind to those suggested by the Senate committee which reported on Title I) for nonpublic schools and school children to be unconstitutional. In *Meek* the Court held that loaning to parochial school pupils textbooks acceptable for use in public schools did not violate the Establishment Clause. However, the Court found that the state could not constitutionally make loans directly to the nonpublic schools for instructional materials and equipment, nor could the state supply professional personnel for guidance counseling and testing, speech and hearing therapy or remedial instruction for educationally disadvantaged children. The professional services were designed to be secular and the Court conceded that the instructional equipment (such as maps, charts, and laboratory equipment) was "self-policing, in that starting as secular, nonideological and neutral, [it] will not change in use." 421 U.S. at 365, 95 S.Ct. at 1763, 44 L.Ed.2d at 232. Nevertheless, the Court found that these neutral materials would inevitably be "subsumed in the religious mission" of the parochial schools. *Id.* at 366, 95 S.Ct. at 1763, 44 L.Ed.2d at 232.

The Court observed that even though the teachers and counselors were employees of the public schools, rather than of the church-related schools in which they were to work, "continuing surveillance" would be necessary since they performed on private premises where "education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained."[5] 421 U.S. at 371, 95 S.Ct. at 1766, 44 L.Ed.2d at 235.

### The Alternatives Available in Missouri.

*Meek*, of course, limits the alternatives available under Title I. With that in

---

**4.** The Court further observed:

It was anticipated, to be sure, that one of the options open to the local agency in designing a suitable program for private school children was the provision of on-the-premises instruction, and on remand this is an option open to these petitioners and the local agency.

417 U.S. at 422–23, 94 S.Ct. at 2286, 41 L.Ed.2d at 175.

In addition, the Court set forth "possible programs" suggested to the Senate Committee, appearing in S.Rep. No. 146, 89th Cong., 1st Sess., 10–11 (1965), which included

. . . teacher aids and instructional secretaries; institutes for training teachers in special skills; supplementary instructional materials; curriculum materials center for disadvantaged children; preschool training programs; remedial programs, especially in reading and mathematics . . . .

*Id.* at 425 n. 20, 94 S.Ct. at 2287, 41 L.Ed.2d at 177.

**5.** The Court observed:

That Act 194 authorizes state-funding of teachers only for remedial and exceptional students, and not for normal students participating in the core curriculum, does not distinguish this case from *Earley v. DiCenso* and *Lemon v. Kurtzman* [403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745], *supra*. Whether the subject is "remedial reading," "advanced reading," or simply "reading," a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists. The likelihood of inadvertent fostering of religion may be less in a remedial arithmetic class than in a medieval history seminar, but a diminished probability of impermissible conduct is not sufficient: "The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion." 403 U.S., at 619, 91 S.Ct., at 2114. And a state-subsidized guidance counselor is surely as likely as a state-subsidized chemistry teacher to fail on occasion to separate religious instruction and the advancement of religious beliefs from his secular educational responsibilities. 421 U.S. at 370–71, 95 S.Ct. at 1766, 44 L.Ed.2d at 235.

mind, we turn to options listed by the Supreme Court in its opinion in the case at bar. The first option was to retain on-the-premises instruction in the public schools and to devise a truly comparable but not necessarily identical program for the parochial schools. Such a program, the Court wrote, might or might not utilize public school teachers on private school premises. The Court recognized, however, that in certain states, statutory and constitutional restrictions on church-state involvement in education might be so severe as to rule out any parochial school program that would be comparable in quality to on-the-premises instruction in the public schools. *Wheeler v. Barrera, supra,* 417 U.S. at 423–25, 94 S.Ct. at 2286–2287, 41 L.Ed.2d at 176–77.

Where no parochial school program comparable to on-the-premises instruction in the public schools can be devised, the second alternative set forth by Mr. Justice Blackmun in *Barrera* is to abandon that program in the public schools and to use other means "such as neutral sites or summer programs" for *both* public and private school children. 417 U.S. at 425, 94 S.Ct. at 2287, 41 L.Ed.2d at 177. The third and least attractive alternative is for Missouri to abandon Title I altogether, if state officials are unable or unwilling to devise comparable programs as required by the Act. *Id.* at 425–26, 94 S.Ct. at 2287–88, 41 L.Ed.2d at 177–78.

■ We note that Missouri is perhaps the only state which prohibits dual enrollment, that is, in construing the Missouri compulsory attendance law, the Missouri Supreme Court has held it illegal for private school children to be brought into public school classrooms during the regular school day for joint instruction. *Special District v. Wheeler,* 408 S.W.2d 60 (1966) (Finch & Hyde, JJ., dissenting). As we stated in our previous opinion:

> In the states where dual enrollment programs have been conducted, the United States Commissioner of Educa-

tion has found that teacher services are provided under Title I in a comparable and equitable manner. Title I specifically offers this method as one of the alternatives for complying with the Act, 20 U.S.C. § 241e(a)(2), and as the Commissioner has pointed out, this is one of the most feasible ways to achieve compliance. 475 F.2d at 1349 n. 18.

The Supreme Court's decision in *Meek* leads us to believe that Missouri may soon have to choose between abandoning all Title I funds or amending its law to permit dual enrollment. For as Mr. Justice Blackmun stated in *Wheeler,* illegality under state law is no defense to noncompliance with Title I. 417 U.S. at 420, 94 S.Ct. at 2284, 41 L.Ed.2d at 174.

*The Guidelines Approved by the District Court.*

This appeal arose after the district court approved certain guidelines which the Missouri Department of Elementary and Secondary Education (MDESE) developed under the prior mandates of this court and the Supreme Court. The guidelines state that MDESE will approve those Title I program applications submitted by local educational agencies "which provide eligible nonpublic school children comparable, but not necessarily identical, services to those provided eligible public school children." They further state that Title I funds spent on programs for parochial school children "shall, except for good cause shown, be not less than 90% nor more than 110%" of the average per pupil expenditure of such funds in public schools.

■ Plaintiffs now contend that the district court erred in approving the guidelines because: (1) comparability is measured therein solely in terms of program cost per pupil; (2) the guidelines do not require provision of free transportation to Title I programs for nonpublic school children; and (3) there is no injunctive decree requiring comparability of programs to be implemented by the public agency.[6]

---

6. Plaintiffs also argue that the district court erred in failing to award costs on the prior appeal. We disagree. In the prior appeal, this court held that comparable services were not

■ We have been assured by counsel for the State Board that the present language on expenditure of funds is only a guideline, not a firm limit. The Board is fully aware that comparability under the Act is a qualitative standard which may well require the expenditure of more funds per parochial school student than the guidelines provide. As we stated in our earlier opinion:

> [I]t is inaccurate to attempt to equate Title I programs on a "fair-sharing" basis which requires an equivalent pro-rata distribution of funds among public and private school students. Fair-sharing of funds is not the intent of Title I. When appraising what is equitable and comparable, the dollar amount allocated can serve only as an indicia of compliance or non-compliance.

475 F.2d at 1347.

We need not determine at present whether free transportation is required. This question must depend upon the specific programs devised for public and private schools and its availability under state law.

■ We do find, however, that the guidelines approved by the district court are deficient in that they fail to describe the specific categories of Title I programs which may be used in accord with state and federal law. In view of the history in Missouri of noncompliance with Title I's comparability requirement, we find that MDESE must take a more active role setting forth in its guidelines

the "machinery for . . . a meaningful program . . . comparable in size, scope and opportunity to that provided public school children." 475 F.2d at 1355–56. MDESE cannot satisfy our earlier mandate merely by restating the broad language of the Act or regulations,[7] leaving it up to local authorities to develop program proposals. To assist in the attainment of comparability, MDESE should take the lead by describing specific types of programs in its guidelines.

■ When the guidelines have been revised with these specifics, petitioners should be afforded an evidentiary hearing, if necessary, to establish by empirical data, that the programs described either are not comparable or that they are not being carried out as described. We do not decide that such further proceedings are necessary. We stress, as we have before, that cooperation from all parties should result in effective Title I programming to the benefit of all the children without further litigation. In this regard, the Supreme Court noted:

> Of course, the cooperation and assistance of the officials of the private school is obviously expected and required in order to design a program that is suitable for the private school. *It is clear, however, that the Act places ultimate responsibility and control with the public agency,* and the overall program is not to be defeated simply because the private school refuses to participate unless the aid is

being provided. However, we refused to require the relief plaintiffs sought, that is, the services of public school teachers in the private schools during the regular school hours. Under the circumstances, we feel that the parties should bear their own costs of the prior litigation.

**7.** As the Supreme Court stated:

[P]etitioners shall be given the opportunity to submit guidelines insuring that only those projects that comply with the Act's requirements and this opinion will be approved and submitted to the Commission. It is also to be understood that the District Court's function is not to decide which method is best, or to order that a specific form of service be provided. Rather, the District Court is simply to assure that the state and local agen-

cies fulfill their part of the Title I contract if they choose to accept Title I funds. . . .
The comparability mandate is a broad one, and in order to implement the overriding concern with localized control of Title I programs, the District Court should make every effort to defer to the judgment of the petitioners and of the local agency. Under the Act, respondents are entitled to comparable services, and they are, therefore, entitled to relief. As we have stated repeatedly herein, they are not entitled to any particular form of service, and it is the role of the state and local agencies, and not of the federal courts, at least at this stage, to formulate a suitable plan.
417 U.S. at 427–28, 94 S.Ct. at 2288, 41 L.Ed.2d at 178.

offered in the particular form it requests. The private school may refuse to participate if the local program does not meet with its approval. But the result of this would then be that the private school's eligible children, the direct and intended beneficiaries of the Act, would lose. The Act, however, does not give the private school a veto power over the program selected by the local agency.

417 U.S. at 424, 94 S.Ct. at 2286, 41 L.Ed.2d at 176 (emphasis added).

Therefore, we feel the guidelines are deficient in failing to place on the public agency the affirmative and ultimate responsibility to implement comparable programs in the private school sector.

We need not now decide what services will or need be provided. The decisions of this court and the Supreme Court outline the standards under which the parties must implement the provisions of the Act. We are confident that the public agencies will seek the aid of the United States Commission on Education and the National Advisory Council on the Education of Disadvantaged Children for further guidance. We think having these parties serve as amicus curiae would be helpful to the district court in formulation of its decree.

In accord with our prior mandate that the district court retain jurisdiction of this litigation, we direct that within a reasonable time as determined by the district court after consultation with the parties, the guidelines be amended by the public agencies to describe in more detail the kind of programs and services to be furnished under the Act so as to assure comparability.[8]

The guidelines and programs shall be incorporated into a specific decree requiring continued compliance with the Act. The district court shall retain jurisdiction of the cause.

---

8. We repeat the Supreme Court's admonition that the district court is not to devise the specific form of service to be provided or the best method of providing it. As observed by the Supreme Court, deference to the judgment of

The cause is remanded to the district court for further proceedings in accord with this opinion.

the public agency is required. However, this does not necessarily mean that the public agency is the final arbiter of what is compliance with the Act and its regulations. This question remains for the district court.