**Arthur L. MALLORY et al.,
Plaintiffs-Respondents,**

v.

**Anna BARRERA et al.,
Defendants-Appellants.**

**No. 59219.**

Supreme Court of Missouri,
En Banc.

Dec. 30, 1976.

Thomas M. Sullivan, Kansas City, Louis C. Defeo, Jr., Jefferson City, for defendants-appellants.

Harry D. Dingman, Kansas City, for plaintiffs-respondents.

G. Dennis Sullivan, Kansas City, for amicus curiae.

HENLEY, Judge.

This is a declaratory judgment action brought by the Commissioner of Education of Missouri (State Commissioner) and the Missouri State Board of Education (State Board) (the plaintiffs) against Anna Barrera, et al. (defendants), parents of students attending elementary or secondary parochial schools in Kansas City, Missouri, seeking resolution of these two questions:

1. Whether funds paid to the State of Missouri by the United States under the provisions of Title I of the Elementary and Secondary Education Act of 1965 (hereinafter the Act or ESEA or Title I)[1] are public funds subject to spending proscriptions of the laws of Missouri.

2. Whether Missouri law prohibits, permits or requires the use of public school personnel paid with Title I funds to provide teaching services to private school children on the premises of private (sectarian and nonsectarian) schools during regular school hours.

Plaintiffs do not bring this action against the defendants as members and representa-

---

1. 20 U.S.C. § 241a, *et seq.*

tive parties of all of a class; on the contrary, plaintiffs' petition explicitly disavows any purpose of making this a class action, the result of which would be binding upon anyone other than the named parties.

In a counterclaim seeking relief in the event the court should hold that Title I funds are public funds subject to the spending proscriptions of the laws of Missouri, defendants prayed that the court by its judgment:

1. Declare that no part of Title I funds paid to the state may be used to provide educational equipment or materials or other services or benefits for children attending nonpublic schools.

2. Enjoin plaintiffs, and those under their control, from participating in Title I, ESEA projects and from providing assurances required by the ESEA to the U.S. Commissioner of Education (hereinafter Federal Commissioner).

Judgment was for plaintiffs and against defendants on the plaintiffs' claim and on the defendants' counterclaim. Defendants appealed. We affirm.

Title I of the Act is a federal program authorizing financial aid "to local educational agencies[2] [of the states] serving areas with concentrations of children from low-income families" to enable those agencies to "expand and improve their educational programs by various means * * * which contribute particularly to meeting the special educational needs of educationally deprived children" attending elementary and secondary schools, both public and private, in those areas.[3]

The Act is designed to be administered by local and state *public* education officials. The administrative structure set up by the Act places primary responsibility for planning, designing and carrying out a Title I program upon the local education agency. The proposed program planned and designed by the local agency is then submitted to the state educational agency[4] for its approval. If approved, the state agency then forwards the proposal to the Federal Commissioner for his approval. If the proposal is approved by him, the Federal Commissioner is authorized to "pay to * * * [the] State * * * the amount which it and the local educational agencies of that State are eligible to receive under * * * [approved proposals]." 20 U.S.C., § 241g(a)(1). The state educational agency is required to distribute these funds to its local educational agencies. 20 U.S.C., § 241g(a)(2). In order to receive state approval, the proposal of the local agency must be designed to provide, among other requirements, that eligible children enrolled in private schools have the opportunity to participate in Title I programs comparable to those provided like children in the public schools of its area. 20 U.S.C., § 241e(a)(2); 45 CFR, § 116.19.

This case may be said to be a "spinoff" from *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), another round of the "apparently endless legal battle" over Title I funds spoken of in the first sentence of *Barrera v. Wheeler,* 531 F.2d 402 (8th Cir. 1976)[5] involving these same defendants on one side and the State Commissioner and State Board on the other.

---

**2.** "Local educational agency" is defined in 20 U.S.C., § 244(6)(B), as follows: "The term 'local educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. Such term includes any other public institution or agency having administrative control and direction of a public

elementary or secondary school * * *." See also 45 CFR, § 116.1(4) (1973).

**3.** The quotations are from 20 U.S.C., § 241a, declaring the policy of the United States.

**4.** A state educational agency is defined in 20 U.S.C. § 244(7), to mean "the officer or agency primarily responsible for the State supervision of public elementary and secondary schools."

**5.** See also: *Barrera v. Wheeler,* 441 F.2d 795 (8th Cir. 1971); *Barrera v. Wheeler,* 475 F.2d 1338 (8th Cir. 1973).

Defendants' primary complaint, manifest in each round of this conflict, is and has been that plaintiffs have failed and refused to approve plans and proposals that would employ the use of teachers, paid with Title I funds, on private school premises during regular school hours; that plaintiffs have thereby arbitrarily and illegally deprived the parochial school children of these defendants and other eligible nonpublic school children of services comparable to those afforded eligible public school children.

The position of the State Commissioner and State Board is and has been that the Missouri Constitution and statutes and the First Amendment of the United States Constitution forbid their approval of any proposed Title I program which would authorize the use of publicly-funded teaching personnel on the premises of nonpublic schools, and that Title I did not require such approval.

Addressing itself to the 1973 decision of the court of appeals in *Barrera v. Wheeler,* supra, the Supreme Court of the United States said in *Wheeler v. Barrera,* supra:

"At the outset, we believe that the Court of Appeals erred in holding that federal law governed the question whether on-the-premises private school instruction is permissible under Missouri law. Whatever the case might be if there were no expression of specific congressional intent, Title I evinces a clear intention that state constitutional spending proscriptions not be pre-empted as a condition of accepting federal funds. The key issue, namely, whether federal aid is money 'donated to any state fund for public school purposes,' within the meaning of the Missouri Constitution, Art. 9, § 5, is purely a question of state and not federal law. By characterizing the problem as one involving 'federal' and not 'state' funds, and then concluding that federal law governs, the Court of Appeals, we feel, in effect nullified the Act's policy of accommodating state law. The correct rule is that the 'federal law' under Title I is to the effect that state law should not be disturbed. If it is determined, ultimately, that the petitioners' position is a correct exposition of Missouri law,

Title I requires, not that that law be pre-empted, but, rather, that it be accommodated by the use of services not proscribed under state law. The question whether Missouri law prohibits the use of Title I funds for on-the-premises private school instruction is still unresolved." 417 U.S. at 410–419, 94 S.Ct. at 2283.

The court noted in *Wheeler v. Barrera,* supra, the decision of this court in *Special District v. Wheeler,* 408 S.W.2d 60 (banc, 1966) (one of the authorities plaintiffs have relied upon in support of their position), but observed that that case did not involve federal financial aid. In *Special District,* we held, *inter alia,* that "[t]he use of public school funds for the education of pupils in parochial schools is not for the purpose of maintaining free public schools" within the meaning of Mo.Const. Art. IX, § 5, and § 166.011, RSMo 1969. See also: *McVey v. Hawkins,* 364 Mo. 44, 258 S.W.2d 927 (Mo. banc 1953).

The question whether the use of public funds in aid of parochial school students and schools violated Mo.Const. Art. I, § 7, or the Establishment Clause of the First Amendment was not presented in *Special District.* Although the First Amendment question was presented in *Wheeler* (417 U.S. at 415, 94 S.Ct. 2274) the court did not reach and decide it. However, less than a year later, that court did decide a similar First Amendment question in *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), a case involving a Pennsylvania statute, the stated purpose and certain provisions of which are analogous to those of Title I, ESEA. *Barrera v. Wheeler,* supra, 531 F.2d at 405. The court held in *Meek* that the Pennsylvania law's provisions for supplying publicly-employed teachers to provide instruction on the premises of sectarian schools violated the constitutional prohibition against laws "respecting an establishment of religion," because of the apparent "potential for political entanglement, together with the administrative entanglement which would be necessary to ensure that auxiliary services personnel remain strictly neutral and nonideo-

logical when functioning in church-related schools * * *." 421 U.S. at 367–372, 95 S.Ct. at 1767. See also: *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

As it relates specifically to education, the public policy of this state, as expressed in its constitution and statutes, is: that free public schools shall be established and maintained by the state for all persons within certain ages;[6] that no public funds shall be used in aid or support of any school controlled by a sectarian denomination;[7] that the public schools shall be under the supervision of the State Board.[8] The State Board, charged with the responsibility of carrying out the educational policies of the state,[9] may not permit or require the use of any public funds for any purpose proscribed by state law.

Title I funds are obviously "public" funds. Speaking of these funds as "federal" to distinguish them from "state" funds does not alter their character as public funds. Nor does the fact that this is "federal aid" make it any the less public funds.

We are inclined to the view, and hold, (1) that when these funds are paid *to the state,* as required by the Act (20 U.S.C., § 241g(a)(1) ), they must be deposited in the state treasury;[10] (2) that when so deposited, these funds are held by the state in trust for the uses and purposes specified in the Title I program approved by the Federal Commissioner, and may be appropriated and used by the state for such of those purposes as are not proscribed by the laws of this state; (3) that that part of these funds in a Title I project which has been approved by the Federal Commissioner for use in a free public school is "money donated to [a] state fund for public school purposes" within the meaning of the laws of Missouri; (4) that the use of any part of Title I funds by the state to provide teaching services to elementary and secondary school children on the premises of parochial schools would constitute the use of public funds (a) in aid of a denomination of religion proscribed by Art. I, § 7; and (b) to help to support or sustain a school controlled by a sectarian denomination proscribed by Mo.Const. Art. IX, § 8. *Harfst v. Hoegen,* 349 Mo. 808, 163 S.W.2d 609, 613–614 [8, 10] (Mo.banc 1942); *Berghorn v. Reorganized School District No. 8,* 364 Mo. 121, 260 S.W.2d 573, 582–583 (1953); *Paster v. Tussey,* 512 S.W.2d 97 (Mo.banc 1974).

Defendants suggest, and ask this court to hold, that a trust agreement method, the theory of which they say has been approved in *Board of Public Buildings v. Crowe,* 363 S.W.2d 598 (Mo.banc 1962) and in cases therein discussed, could be utilized to create a special trust fund, separate and apart from the state treasury, with the state Treasurer or other state officers as trustee, to receive, hold, disburse and account for Title I funds in accord with the Act and thereby avoid the fiscal scheme created by the Missouri Constitution, especially its spending proscriptions.

We recognize and approve the holdings in *Crowe,* supra, and cases discussed therein, based, as they are, on their particular facts. However, we note that they did not involve, as this case does, the use of public funds for purposes proscribed by the state constitution.

We note, too, that we are not, in fact, presented with a justiciable issue as to whether a trust agreement and fund may

---

6. Mo.Const. Art. IX, § 1(a).

7. Mo.Const. Art. IX, § 8.

8. Mo.Const. Art. IX, § 2(a); § 161.092(2), RSMo 1969.

9. See footnote 8.

10. Mo.Const. Art. III, § 36 provides, in part: "All * * * money received by the state shall go into the treasury * * *." See also:

Art. IV, § 15, providing, in part: "All * * * moneys received by the state from any source whatsoever shall go promptly into the state treasury, and all interest, income and returns therefrom shall belong to the state * * *." See also: Art. IX, § 5, which provides, in part: "[A]ll moneys * * * donated to any state fund for public school purposes * * * shall be paid into the state treasury * * *." See also: § 166.011, RSMo 1969.

be utilized to receive, hold and disburse Title I funds, because such an agreement for those particular purposes, and all the issues it might well present are foreign to the pleadings in this case. Defendants' "suggestion" that such a fund "could be" utilized does not present us with a live, contested· trust agreement to which we could apply a decision; they present only a subject with which they ask us to deal in the abstract and, with that accomplished, they ask us to render a decision which could be advisory only. We decline to indulge in that fruitless exercise.

■ Defendants call attention to that part of § 38(a) of Art. III of the Constitution which provides that money may be received by the state from the United States and distributed for any public purpose designated by the United States.[11] They assert that the furnishing of public school personnel to provide teaching services to eligible children on the premises of parochial schools has been designated by the United States as a public purpose for which Title I funds may be used. Therefore, argue defendants, these funds may be expended by the state for this purpose notwithstanding other provisions of our constitution which specifically proscribe the use of public funds therefor.

We question the validity of the premise asserted by defendants that on-the-premises parochial school instruction has been, with authority, designated a purpose for which Title I funds may be used, particularly in view of *Meek v. Pittenger,* supra. But, we do not base our decision on First Amendment grounds; we base it on the provisions of the constitution of this state.

We disagree with defendants' argument that § 38(a) authorizes the state to expend Title I funds for on-the-premises parochial school instruction notwithstanding other provisions of our constitution which specifically proscribe the use of public funds for that purpose. Section 38(a) authorizes the state to receive and disburse these funds for

a public purpose designated by the United States, but it does not authorize or require their use for a purpose so designated which is prohibited by other provisions of our constitution, such as Art. I, § 7, and Art. IX, § 8.

■ As to defendants' counterclaim, there is evidence (1) that "Title I funds are used [by the state] to provide certain textbooks and library books and reading materials sent in to the nonpublic schools * * *" and (2) that Title I funds have been approved by the state for use "to transport the nonpublic school child from the nonpublic school to the public school for * * * after school services or Saturday services * * *." Clearly, the use by the state of public funds to provide textbooks (*Paster v. Tussey,* 512 S.W.2d 97, 104 (Mo.banc 1974)) for use in parochial schools, or to provide transportation (Mo.Const. Art. IX, § 8; *McVey v. Hawkins,* 364 Mo. 44, 258 S.W.2d 927 (Mo.banc 1953)) for parochial school students, is impermissible under the constitution of this state.

This and other evidence to which defendants refer, developed in cross-examination of one of plaintiffs' witnesses, is, as we understand it, presented in the context of what had been approved by the state in previous plans according to the State Board's understanding of what was "approvable" under the Act and Missouri law and what had been approved by the state in the present plan according to the State Board's understanding of what was "approvable" under the Act and decisions of federal courts. It is not at all clear from the testimony of this witness whether he was speaking of previously-approved plans which had been "disapproved" by the federal courts or the present existing plan when he referred to (1) funds used for books and other materials, and (2) funds approved for use for transportation.

■ We conclude that there is no substantial evidence in this record to support the injunctive relief sought by defendants.

11. Section 38(a) reads, in part, as follows: "Money or property may also be received from the United States and be redistributed together with public money of this state for any public purpose designated by the United States."

■ The trial court did not err in denying the rather broad declaratory relief sought by defendants, and we decline to do so, because what is said herein is sufficient to dispose of the issues raised in both the petition and the counterclaim.

The judgments on plaintiffs' claim and defendants' counterclaim are affirmed.

SEILER, C. J., and MORGAN, HOLMAN and DONNELLY, JJ., concur.

FINCH, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of FINCH, J.

FINCH, Judge (dissenting).

I respectfully dissent. I would hold that money received by the State of Missouri from the federal government under the provisions of Title I of the Elementary and Secondary Education Act of 1965 (hereinafter Title I) for use in meeting the special educational needs of educationally deprived children in areas with a concentration of children from low-income families does not become "money donated to a state fund for public school purposes" or "public funds" of Missouri subject to the spending proscriptions of the Missouri Constitution applicable to funds properly so classified.

The conclusion in the principal opinion that Mo.Const. Art. I, § 7, Art. IX, § 5, Art. IX, § 8, and perhaps other sections thereof, are applicable to the use of these Title I funds is based on its holding that when received and deposited in the state treasury, they lose their character as federal funds granted to the state for redistribution for the specific purposes for which they were awarded and assume the character of state funds subject to all of the restrictions and limitations imposed by the Missouri Constitution on the appropriation and use of regular state public funds. In so deciding, the principal opinion first finds that such Title I funds constitute "money donated to a state fund for public school purposes". The quoted words are contained in Mo.Const. Art. IX, § 5, and it is obvious from the opinion, as well as from respondents' brief wherein

this proposition was advanced, that under the principal opinion these Title I funds are subject to Art. IX, § 5. However, the principal opinion overlooks the fact that if this were true, said constitutional provision would require that such Title I funds be invested and only the income therefrom used. Such utilization of this money would not be in accord with Title I and is not how these funds actually are handled. I submit that these Title I funds are not subject to Art. IX, § 5, because they are not "money donated to a state fund for public school purposes". Instead, they are funds granted the respondents for distribution to local educational agencies for use in a plan which, as the principal opinion recognizes, "must be designed to provide * * * that eligible children enrolled in private schools have the opportunity to participate in Title I programs comparable to those provided like children in the public schools of its area".

The principal opinion also speaks of these Title I funds becoming "public funds" of Missouri, but I find no authority cited which compels or even supports that conclusion. The legislature has not so treated them. Instead, it has recognized that these Title I funds remain federal funds which are received by respondents for the purpose of being distributed and used in accordance with the terms of the Act. To illustrate, an appropriation bill covering appropriation of these funds to the State Board of Education provided as follows:

"Section 2.360. To the State Board of Education

All allotments, grants and contributions of funds from the federal government, paid into the State Treasury under the provisions of the Elementary Secondary Act, Title I, II and VI for the purpose of administration and distribution to schools

From Federal Funds" Laws 1969, p. 10. Obviously, the legislature did not consider that when these Title I funds were received from the federal government and placed in the state treasury they were thereby converted to general state public funds. They were not so appropriated.

That there is a distinction between state funds and federal money received and distributed by the state (as in the case of Title I funds) and that such federal funds are not subject to constitutional constraints imposed by the Missouri Constitution on Missouri public funds is made crystal clear by Art. III, § 38(a) of the present Missouri Constitution which provides as follows:

"The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation, excepting aid in public calamity, and general laws providing for pensions for the blind, for old age assistance, for aid to dependent or crippled children or the blind, for direct relief, for adjusted compensation, bonus or rehabilitation for discharged members of the armed services of the United States who were bona fide residents of this state during their service, and for the rehabilitation of other persons. Money or property may also be received from the United States and be redistributed together with public money of this state for any public purpose designated by the United States."

During extended debate in the constitutional convention on this section, there was an attempt to delete by amendment what is now the last sentence of Art. III, § 38(a). It is apparent from those proceedings that the sponsors of what is now the second sentence of § 38(a) intended thereby to recognize that money would be available to the state from the federal government for redistribution and use for purposes specified by the federal government, some of which might not even be foreseeable at the time of the constitutional convention and which might even be impermissible by means of state funds, and that it was intended by the second sentence of § 38(a) to permit the state to receive and redistribute such federal funds for the purposes specified by the federal government. Receipt thereof is not made mandatory, of course, and the state would be free to decline to accept them. If accepted, however, the distribution of those federal funds was not to be subject to limitations imposed by the Missouri Constitution on the appropriation and use of Missouri's own public funds.

This court has recognized that funds received for a specific purpose but deposited in the state treasury do not thereby automatically become money "belonging to the state" or state funds which are subject to constitutional proscriptions as to its use. In *State ex rel. Stevenson v. Stephens*, 136 Mo. 537, 37 S.W. 506 (1896), the question was whether $100,000 deposited in the state treasury for the narrow purpose of protecting investors in certain companies was money "belonging to the state" and, hence, subject to various constitutional restrictions such as those relied upon by respondents herein. A state statute required that such funds be deposited with the state treasurer. Holding that these funds were not state funds subject to constitutional limitations, the court, in discussing constitutional provisions alleged to be applicable, said at 509:

"It is manifest that these provisions only apply to money 'belonging to the state.' The money in question, though it was deposited with the treasurer, was for the specific purpose of making good the security intended for the protection of those dealing with bond investment companies, and was not money belonging to the state, within the meaning of the constitution."

See also *Board of Public Buildings v. Crowe*, 363 S.W.2d 598 (Mo.banc 1962); *State ex rel. St. Louis Police Relief Ass'n v. Igoe*, 340 Mo. 1166, 107 S.W.2d 929 (1937); *State ex rel. Thompson v. Board of Regents*, 305 Mo. 57, 264 S.W. 698 (banc 1924).

That there is a difference between state funds and federal funds earmarked for specific purposes which the state receives and distributes is implied by the language used by this court in its opinion in *Paster v. Tussey*, 512 S.W.2d 97 (Mo.banc 1974), when it said at 105: "This case involves the expenditure of 'state' funds and not the expenditure of 'federal' funds." If, as the principal opinion concludes, Title I federal funds become state funds when received

and deposited in the state treasury, there would have been no occasion for a comment such as that made in *Paster.*

As previously indicated, in my view it is clear that even without Art. III, § 38(a) these federal funds, received for distribution and use in accordance with Title I, do not become public funds of Missouri and are not subject to constitutional constraints imposed on the appropriation and use of Missouri's own public funds. This conclusion is made even more inevitable by the last sentence of Art. II, § 38(a), when, as here, we deal entirely with federal funds. I should point out that in so concluding, I would not reach or express any opinion on whether that sentence would have the effect of freeing "public money of this state", when added to federal money, from other constraints contained in the Missouri Constitution. That question is not before us in this case as we deal with Title I funds *only.* Such an issue can be briefed and decided if and when a case involving that issue is presented. I would hold only that Art. III, § 38(a) permits receipt and distribution of federal money free of constraints imposed by our constitution on the use of Missouri's public funds.

Having concluded that Title I funds do not become "state funds" or "money donated to a state fund for public school purposes" and are not subject to the constraints of the Missouri Constitution on state public funds, I would so tell the respondents in their declaratory action. I would rule that they are free to implement a plan for administering Title I funds pursuant to the requirements of that act without being bound by the restrictions imposed by the Missouri Constitution on the use of Missouri's public funds. As pointed out in *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), *modified,* 422 U.S. 1004, 95 S.Ct. 2625, 45 L.Ed.2d 667 (1975), and in *Barrera v. Wheeler,* 531 F.2d 402 (8th Cir. 1976), it is incumbent on Missouri, and more particularly respondents, to devise a program which will provide for private school children a program for utilization of Title I funds which is comparable to the program provided for public school children. Various possible alternatives are discussed in the foregoing decisions, the decision in the Eighth Circuit suggesting the possibility that abandonment of such program in Missouri may be necessary if satisfactory comparable programs cannot or are not devised. Of course, whether such plan, when proposed, complies with the requirements of Title I will continue to be, as it has been throughout this extended litigation, a federal question to be decided by the federal courts.